IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| THOMAS GORCZYNSKI, on behalf of himself and all others similarly situated,<br><br>           Plaintiff,<br><br>     v.<br><br>ELECTROLUX HOME PRODUCTS, INC., et al.,<br><br>        Defendants. | Civil No. 18-10661-RMB-KMW |

**PLAINTIFF'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF CLASS CERTIFICATION</u>**

**<u>[REDACTED]</u>**

## Table of Contents

I.   INTRODUCTION ........................................................................................1

II.  STATEMENT OF FACTS .........................................................................2

    A.   The Microwaves ...............................................................................2

    B.   The Handle Defect.............................................................................5

        1.   The Defective Handles...........................................................6

        2.   The Microwave Handle Does Not Comply With ASTM
            C1055 ....................................................................................8

        3.   UL 923 Does Not Apply To The Handle Defect......................9

    C.   Electrolux's Knowledge of the Handle Defect ..................................12

        1.   Electrolux Concedes Knowledge of the Handle Defect Prior
            to Plaintiff's Microwave Purchase.............................................12

        2.   Electrolux Should Have Known of Handle Defect Prior to
            2014........................................................................................13

        3.   Electrolux Ignored the Handle Defect .....................................16

    D.   Plaintiff's Experience with the Microwave Handle............................17

    E.   The Class Suffered Damages ..............................................................19

III.  THE CLASS DEFINITION IS ASCERTAINABLE.....................................21

    A.   The Class Is Defined Using Objective Criteria..................................21

    B.   Reliable And Administratively Feasible Means Exist To Identify The
        Class .................................................................................................22

IV.  THE REQUIREMENTS FOR RULE 23 CERTIFICATION ARE
    SATISFIED ...............................................................................................23

    A.   The Class Meets The Rule 23(a) Requirements ..................................24

        1.   The Class is Sufficiently Numerous .........................................24

        2.   Plaintiffs and Class Members Share Common Questions of
            Fact and Law............................................................................26

        3.   Plaintiff's Claims are Typical of the Class Members' Claims .28

        4.   There is Fair and Adequate Representation ..............................29

    B.   The Class Meets The Requirements Of Rule 23(b)(3) .......................32

i

1. Common Questions of Law and Fact Predominate Over Questions Affecting Only Individual Class Members..............32

    a) New Jersey Consumer Fraud Act.......................................35

        (i) Electrolux's Unlawful Conduct..................................36

            (a) Electrolux misrepresents Microwaves as "Over-The-Range"............................36

            (b) Electrolux Concealed the Handle Defect...37

        (ii) Plaintiff's and the Class's Ascertainable Loss......40

        (iii) Electrolux's Unlawful Conduct Caused the Ascertainable Loss .........................................41

    b) New Jersey Implied Warranty of Merchantability and Magnuson Moss Warranty Act ...............................43

    c) Plaintiff's Damages Model Shows Common Harm and Classwide Damages..................................................46

C. This Class Action Is A Manageable And Superior Method Of Adjudication .......................................................49

V. CONCLUSION...............................................................50

ii

## __Table of Authorities__

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)............................................32

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)....................................................... 24,32

*Arlandson v. Hartz Mountain Corp*., 792 F. Supp. 2d 691 (D.N.J. 2011) .............44

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007).......................................47

*Byrd v. Aaron's Inc*., 784 F.3d 154 (3d Cir. 2015)........................................... 21, 23

*Chaudhri v. Lumileds LLC*, 2018 WL 6322623 (D.N.J. Dec. 3, 2018)...................36

*City Select Auto Sales, Inc. v. BMW Bank of N.A., Inc*.,
  867 F.3d 434 (3d Cir. 2017) ........................................................................... 21-23

*Coba v. Ford Motor Co*., 932 F.3d 114 (3d Cir. 2019) ..................................... 38-39

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ......................................... 46-48

*ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ……………………………48

*Cox v. Sears Roebuck & Co.,* 138 N.J. 2 (1994)................................................. 35-36

*Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir.2006).........................................34

*DiIorio v. Structural Stone & Brick Co.*, 368 N.J. Super. 134 (App. Div. 2004) ...36

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017) ...............34

*Dzielak v. Whirlpool Corp*., 2019 WL 6607220 (D.N.J. Dec. 5, 2019) .................44

*Dzielak v. Whirlpool Corp.*, 2017 WL 1034197 (D.N.J. Mar. 17, 2017)…. ……..48

*Francis E. Parker Memorial Home, Inc. v. Georgia-Pacific LLC*,
  945 F. Supp. 2d 543 (D.N.J. 2013)........................................................38

*Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1 (N.J. 2004)............................................40

*Gennari v. Weichert Co. Realtors*, 148 N.J. 582 (1997) .........................................36

*Gonzalez v. Corning*, 885 F.3d 186 (3d Cir. 2018) .................................................24

*Gorczynski v. Electrolux Home Prod., Inc.*,
  2019 WL 5304085 (D.N.J. Oct. 18, 2019) .........................................................46

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013)................................21

*In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ...............................................................................29

*In re General Motors LLC Ignition Switch Litig.*,
  339 F.Supp.3d 262 (S.D.N.Y. 2018) .................................................................40

*In re Gerber Probiotic Sales Practices Litig.*, 2014 WL 5092920
  (D.N.J. Oct. 10, 2014)................................................................................. 30-31

*In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016) ...............................25

*In re Myford Touch Consumer Litig.*, 2016 WL 7734558,
  (N.D. Cal. Sept. 14, 2016) ......................................................................... 43, 45

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450
  (D.N.J. 1997)........................................................................................ 25, 28, 29

*In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314
  (D.N.J. Sept. 13, 2005) .....................................................................................49

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) ................................................................... *passim*

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ...........44

*Int'l Union of Operating Engineers Local No. 68*
  *Welfare Fund v. Merck & Co., Inc*., 192 N.J. 372 (N.J. 2007)............................35

*Judge v. Blackfin Yacht Corp.*, 357 N.J.Super. 418, 815 A.2d 537 (2003).............38

*Lieberson v. Johnson & Johnson Consumer Companies, Inc*.,
  865 F. Supp. 2d 529 (D.N.J. 2011) ................................................................ 44-45

*Lightning Lube, Inc. v. Witco Corp*., 4 F.3d 1153 (3d Cir. 1993) ...........................38

*Mango v. Pierce-Coombs*, 370 N.J. Super. 239 (App. Div. 2004)..........................36

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012).......... 36, 42, 43

*Neuss v. Rubi Rose, LLC*, 2017 WL 2367056, at *5 (D.N.J. May 31, 2017).... 30-31

*New Jersey Transit Corp. v. Harsco Corp.*, 497 F.3d 323 (3d Cir. 2007) .............46

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ...........................................35

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................23

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) .........................................26

*Rikos v. Procter & Gamble Co.*, 2014 U.S. Dist. LEXIS 109302
  (S.D. Ohio June 19, 2014) ....................................................................................49

*Rikos v. Procter & Gamble*, 799 F.3d 497 (6th Cir. 2015)............................... 27, 50

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir.2013).....................................26

*Schwartz v. Avis Rent-A-Car System, LLC*, 2014 WL 4272018
  (D.N.J. Aug. 28, 2014)..........................................................................................25

*Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84 (D.N.J. 2011).................... 40, 46

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001)..................................................25

*Stewart v. Smart Balance, Inc.*, 2012 WL 4168584 (D.N.J. June 26, 2012)..........31

*Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912 (D.N.J. Aug. 16, 2005)....40

*Suarez v. E. Int'l Coll.*, 428 N.J.Super. 10, 50 A.3d 75 (2012) ...............................39

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ................................26

*Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547 (Law. Div. 2001) .......41

*Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783 (N.J. 2005)....................40

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ........................ 32, 33, 46

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
     226 F.R.D. 207 (D.N.J. 2005)...............................................................................25

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................... 24, 28

*Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014)................................................24

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) ............44

**Statutes**

N.J.S.A. § 2A:14–1 ....................................................................................................36
N.J.S.A. § 12A:2-314.......................................................................................... 43, 44
N.J.S.A. § 12A:2-316.................................................................................................46
N.J.S.A. § 56:8-2........................................................................................................35
U.C.C. § 2-314 ...........................................................................................................43

**Other Authorities**

Magnuson-Moss Warranty Act.................................................................... *passim*
New Jersey Consumer Fraud Act ............................................................... *passim*

**Rules**

Fed. R. Civ. P. 23 ............................................................................... *passim*

## I.   INTRODUCTION

This litigation is ideal for Rule 23 class treatment.  In one stroke, this action will determine whether Defendant, Electrolux Home Products, Inc. ("Electrolux"), is liable under New Jersey law for an alleged defect in over 80,000 "Over-The-Range" ("OTR") Microwaves and the appropriate measure of damages for the proposed Class.  These Microwaves have handles that are hollow tubes of thin stainless steel, which naturally conduct heat from the cooktop below. The handles reach temperatures that violate ASTM C1055, and present an objective burn risk. ("Handle Defect").  Temperatures observed on Plaintiff Gorczynski's Microwave handle reached 174.6°F when the cooktop was in use.  Electrolux admits that it has had knowledge of the Handle Defect since January 2014, at the latest, yet never disclosed it to customers, and continues to misrepresent that the Microwaves are safe to install "Over-The-Range."  Common evidence establishes that the Handle Defect, and Electrolux's primary defenses – compliance with UL923 and limiting the statute of limitations for warranty claims – apply to all members of the Class. The proposed Class should be certified for violations of the New Jersey Consumer Fraud Act, for breach of the implied warranty of merchantability under New Jersey law, and for violations of the Magnuson-Moss Warranty Act.

## II.     STATEMENT OF FACTS

### A.     THE MICROWAVES

This action seeks redress for a latent, concealed defect in the stainless-steel handles of Frigidaire Gallery Over-The-Range Microwave Ovens ("Microwaves") distributed in New Jersey by Electrolux.[1]   Six self-identifying stainless-steel handles include the Handle Defect inherent in their design, and are the only means to open the doors of thirteen models of Microwaves sold in New Jersey and represented for use "Over-the-Range." Ex. 1 (Electrolux Obj. and Supp. Resp. to Interrogatories) at Nos. 1, 5; ECF No. 102, ¶36.  The Microwaves and handles with the Handle Defect are identified by model number in the chart below, including the numbers shipped to New Jersey and the retail replacement cost for each:

| HANDLE PART # (N.J. Units) | OTR MODEL # (N.J. Units) | RETAIL PRICE FOR HANDLE REPLACEMENT |
|---|---|---|
| 5304477399 (███) | FFMV152CLW (███) FFMV162LW (███) | ███ |
| 5304477401 (███) | FFMV154CLS (███) FFMV164LS (███) LFMV164QF (███) | ███ |
| 5304471828 (███) | FGBM205KF (███) | ███ |
| 5304471830 (███) | FGMV174KF (███) FGMV174KM (███) | ███ |
| 5304481502 (███) | FGMV154CLF (███) FGMV175QF (███) | ███ |
| 5304472054 (███) | FGMV205KF (███) | ███ |

---

[1] "Microwaves" is a defined term to include each of following microwave models Electrolux sold in New Jersey: FFMV152CLW; FFMV162LW; FFMV154CLS; FFMV164LS;  LFMV164QF;  FGBM205KF;  FGMV174KF;  FGMV174KM; FGMV154CLF; FGMV175QF; and FGMV205KF.

*See* Ex. 1 at Nos. 1, 5.

The Microwaves are manufactured pursuant to Finished Product Purchase Agreements between Electrolux and two foreign suppliers: Midea Microwave and Electrical Appliances Manufacturing Co., Ltd. ("Midea China") and Sharp Appliances Thailand Limited ("SATL") (collectively "Suppliers"). Ex. 2 (Finished Product Purchase Agreement - Midea China); Ex. 3 (Finished Product Purchase Agreement - SATL). The size, design and thermal properties for the Microwaves and their handles are nearly identical. Ex. 4 (Expert Report of Michael Bak, Ph. D ("Bak Rpt.")), ¶¶33-40, Figure IV-3. The installation instructions for the Microwaves are uniform and Electrolux recognizes the Handle Defect manifests when the Microwaves are installed as instructed. Ex. 5 (Electrolux_46322-34) (███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Ex. 6 (Dep. of Electrolux Pursuant to Rule 30(b)(6) - Ronald Tynes) at 105:16-107:2.

The Microwaves are packaged in China by Midea China and in Thailand by SATL. Ex. 7 (Dep. of Electrolux Pursuant to Rule 30(b)(6) – Christopher Smith) at 58:14-20. All warranty information, installation instructions and user guides are provided by Electrolux, sealed in the Microwave's box and shipped to the United States without being opened until purchase by the consumer. *Id*. at 58:14-59:02;

84:17-87:03. The Microwave's warranty language is uniform all purchasers, and none of the warranty terms appear on the exterior packaging of the Microwaves. *See* ECF No. 26-5, Ex. E at p. 33; Ex. 6 at 86:01-05; Ex. 7 at 65:03-08. The warranty terms are admittedly for the end user. Ex. 6 at 86:06-17. The Microwaves are not modified from the time of manufacture to purchase by consumer. *Id.* at 58:10-13; 59:3-6.

All Microwaves are uniformly represented by Electrolux as "Over-The-Range" Microwaves designed and intended for installation over a cooktop. ECF No. 102, ¶¶1-2; Ex. 6 at 19:4-12; 30:14-18. The Finished Product Purchase Agreement between Electrolux and its Suppliers, SATL and Midea China, expressly identify the Microwaves as "Over the Range ('OTR')." Ex. 3, Appendix 3 at Electrolux_3232; Ex. 2 at Electrolux_2990. In addition to the Microwaves' exterior packaging stating the Microwave is for "Over-the-Range," the Installation Instructions only provide directions for installing the Microwaves over a cooktop or range. ECF No. 26-1, Ex. A. Electrolux does not limit the Microwave's installation over any particular range or cooktop, and Electrolux has never warned of the Handle Defect or disclosed it to any consumer under any condition. Ex 8 (Electrolux Obj. and Supp. Resp. to Request for Admissions) at No. 14; Ex. 6 at 112:02-15.

4

## B.    THE HANDLE DEFECT

The Microwaves' handles were likewise designed and intended for installation over a cooktop because they are designed for use with an "Over-The-Range" Microwave. ECF No. 102, ¶¶1-2; Ex. 6 at 19:4-12; 30:14-18.   Each Microwave has one of the six handles identified above as the only means to operate the Microwave.  Ex. 9 (Electrolux Obj. and Supp. Resp. to Plaintiff (*Rice*) Third Set of Request for Admissions) at No. 28; Ex. 10 (Dep. of Harri Kytomaa, Ph. D) at 45:03-06 ("███████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████).  The handles are the only way to open the Microwave door.  *See id.*

Neither Electrolux nor its Suppliers performed any testing or analysis to prove or disprove the Handle Defect, or identify the root cause of its existence. Ex. 6 at 102:18-22.  Plaintiff, however, has established the root cause of the Handle Defect, its impact, and available design alternatives to cure the Handle Defect. Plaintiff retained Dr. Michael Bak to create a finite element model ("FEM") of the Microwaves' handles to demonstrate why they get so hot. *See* Ex. 4, ¶¶1-2; Ex. 11 (Dep. of Michael Bak, Ph.D.) at 82:15-83:15.  Dr. Bak's work established the root cause of the Handle Defect as the Microwave handles' hollow construction using razor thin stainless steel walls that fail to conduct away the heat radiating from the cooktop below causing high temperatures in the handle.  Ex. 4, ¶77; Ex. 11 at

88:07-89:17.  Dr. Bak also identified a clear remedy for the Handle Defect: change the material from stainless steel to aluminum and the handle temperature under identical conditions would decrease nearly 50°F, from 142.7°F to 93.5°F.  Ex. 4, ¶¶68, 77(E).

### 1. The Defective Handles

The handles with the Handle Defect are identifiable by Handle Part numbers, as noted above, and each is nearly identical in design and engineering (i.e. all made of stainless steel,  and all intended for use on OTR Microwaves) with only slight aesthetic variations.[2]  Ex. 4 (Bak Report), ¶73, Appendix C.I, II, IV, V, and VI.  These six handles were paired with eleven Microwave models since at least January 2012 without modification to the handles' design or manufacturing.  Ex. 1 at Nos. 5, 8; Ex. 6 at 25:3-12, 30:14-24.  The physical details for the Microwaves and their handles appear in the chart below and possess nearly identical physical design characteristics:

---

[2] Electrolux also sold approximately 546 "Pro" Series OTR Microwaves in New Jersey identified by Microwave Model Nos. E30MH65QPS (71) and FPMV189KF (475) using Handle Part Nos. 5304494081 and 5304472053 respectively. *See* Ex. 1 at Nos. 1, 5; Ex. 4.  Plaintiff analyzed these two Pro Series handles, and while they heated to levels that likely warrant liability, these handles behaved differently than the non-Pro Series handles. *See* Ex. 4, ¶¶74-76.  Plaintiff is not seeking certification of the Pro Series handles in this motion.



*See* Ex. 4 at Figure IV-3. These same six handles on the same eleven models were sold in New Jersey since before the proposed class period began, May 10, 2012.

Plaintiff Gorczynski's Microwave was used to establish a base case configuration for Dr. Bak's FEM "to determine what factors affect the surface temperature of the handle."  Ex. 11 at 25:10-26:05.  The Microwave was set at 34.5 inches above the cooktop, as it is in Plaintiff Gorczynski's kitchen, which is four and a half inches *higher* than Electrolux's instructions require.  *See* Ex. 4 at Figure V-1; ECF No. 26-1, Ex. A at EN-5. Actual temperatures for Plaintiff Gorczynski's Microwave handle were measured, correlated, and compared to Dr. Bak's FEM. Ex. 4, ¶56.

Using the FEM, Plaintiff conducted 22 simulations to understand how each relevant physical and thermal characteristic influenced the Microwaves' handle temperature. Ex. 4, ¶¶56-73, Figure VI-4; Ex. 11 at 92:06-93:13.  Each Microwave handle is a hollow tube of stainless steel constructed of walls between 0.8 and 1.2 mm thick. Ex. 8 at No. 13; Ex. 4, ¶40.  The grade of stainless steel used for each

handle was identified and all thermal properties considered and measured in the FEM. Ex. 4 at Figure IV-3; Ex. 11 at 189:04-191:14. Emissivity measures how effective a material's surface is at emitting energy as thermal radiation and ranges from zero and one, where one represents radiation from an ideal black surface. Ex. 4, ¶37. The emissivity of each Microwave handle was calculated and considered in the FEM. Ex. 12 (Rpt. of David P. Pope, Ph.D.) at 2; Ex. 4 at Figure IV-3. The FEM also detailed the impact of various sizes of pots by diameter and height along with differing levels of heat radiating from the cooktop upward to the Microwaves' handle. Ex. 4, ¶¶63-73. The resulting temperature of the handle for each simulation is reported in Figure VI-4. *Id.* at Figure VI-4. The FEM also established how thicker walls of stainless steel, or simply changing the material to aluminum, eliminate the Handle Defect. *Id.*, ¶¶63-73.

This FEM proved that the root cause of the Handle Defect is the handles' design – a hollow tube of thin stainless steel used over a cooking surface. Ex. 4, ¶77. This root cause is the same for Plaintiff Gorczynski and each Class member. *Id.*, ¶73.

### 2. The Microwave Handle Does Not Comply With ASTM C1055

ASTM C1055 is the standard that governs the Handle Defect. Ex. 13 (Rpt. of Roger L. Boyell, Electronics Analyst) at 5; Ex. 14 (ASTM C1055-03 (Reapproved 2014), "Standard Guide for Heated System Surface Conditions that

Produce Contact Burn Industries."). The purpose of this nationally recognized standard is to "address the skin contact temperature determination for passive heated surfaces" and set the condition for safe human contact with a passively heated surface such as the Microwaves' handles. *Id.*

The Microwave handle temperatures observed in Plaintiff's handle confirms a violation of ASTM C1055. *Id.* at 6-8. Electrolux has no basis to dispute the temperature readings observed for Plaintiff Gorczynski's Microwave handle. *See* Ex. 15 (Decl. of Daniel E. Farnan) at Exs. 9, 11 and 13. The Handle Defect presents a "human skin burn hazard" because the "temperature of the microwave oven handle violates the limits stated in ASTM C1055." Ex. 13 at 10. Both the observed temperature of the Microwaves' handle and the temperature standards of ASTM C1055 are objectively established and violated.

### 3.    UL 923 Does Not Apply To The Handle Defect

Because the Microwaves' handles do not comply with ASTM C1055 due to the Handle Defect, Electrolux relies on UL 923, Section 42, which sets a maximum surface temperature for handles of 131°F. *See* Ex. 16 (UL 923). This is the only testing Electrolux and/or its Suppliers ever attempted. Ex. 6 at 81:21-82:10 ("███████████████████████████████████████████████████ ████████"); 83:1-11; Ex. 16 at Section 42.

The testing set forth in Section 42 of UL 923, however, does not apply to the Handle Defect for two reasons. *First*, it applies only to Microwaves with a thermal element; and eight of the Microwave Model Nos. FFMV164LS, LFMV164QF, FFMV162LW, FGMV175QF, FGMV174KF, FGMV174KM, FGBM205KF and FGMC205KF, do not contain a thermal element. Ex. 16 at Section 42.1.1 ("██ ████████████████████████████████████"); Ex. 7 at 155:06-156:04; Ex. 17 (Dep. of UL Pursuant to Rule 30(b)(6) – Robert Dellevelle) at 130:05-131:15. This was clearly communicated to Electrolux by Sharp in an October 1, 2015 email stating: "████████████████████████████████████████████ ██████████████████████████████████)." Ex. 18 (Electrolux_32591-96) at Electrolux_32592. This undisputed fact was confirmed by a UL Corporate Designee: "████████████████████████████████████████ ████████████████████████████████████." Ex. 17 at 131:20-24 (emphasis added); *id.* at 175:03-11 (██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████"). Thus, absent a thermal element, Section 42 of UL 923 is inapplicable.

*Second*, even if the Microwaves did include a thermal element, Section 42 of UL 923 was designed to test surfaces for heat transfer from the internal thermal

element of the microwave to the exterior surface temperature – as Electrolux has acknowledged.  Ex. 7 at 154:24-155:04 (█████████████████████████ ███████████████████████████████████████████ ███████████████████████) (objection omitted); Ex. 17 at 133:02-07, 136:20-137:10.  This was communicated to Electrolux by its Microwave supplier in October 2015, stating: "█████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████."  Ex. 18.  The Surface Temperature Tests set forth in Section 42 of UL 923 were confirmed by the UL Corporate Designee pursuant to Rule 30(b)(6) to measure the conductivity of heat from the internal thermal element to the external parts.  *See* Ex. 17 at 136:20-137:10 (objections, colloquy omitted).

But the Handle Defect manifests from heat radiating upward from the cooktop below, not from any thermal element within the microwave itself.  The UL Corporate Designee expressly disavowed the application of UL 923, Section 42 Surface Temperature Test application to the Handle Defect, stating: "████████████ ███████████████████████████████████████████ ████████████████████████"  Ex. 17 at 144:18-24 (objection omitted).  UL knows of no testing for conditions described by the Handle Defect. Ex. 17 at 146:04-16 (objection omitted), 151:11-152-05 ("██████████████████████████████

████████████████████████████████████████

████████████ ").  Thus, surface temperature testing set forth in Section 42, UL 923 was not designed or intended to test for the conditions presented by the Handle Defect.  Electrolux's reliance on this test is misplaced.

### C.   ELECTROLUX'S KNOWLEDGE OF THE HANDLE DEFECT

#### 1.   Electrolux Concedes Knowledge of the Handle Defect Prior to Plaintiff's Microwave Purchase

Electrolux had actual knowledge of the Handle Defect prior to Plaintiff Gorczynski's purchase of his Microwave on May 16, 2015.  Ex. 6 at 93:15-19 ("██

████████████████████████████████████████

████████████████████████████████████████

████████████████ .").  On December 27, 2013, Ms. Rice, the plaintiff in a related action pending in federal court in Pennsylvania, telephoned Electrolux to lodge a complaint about the Microwave handle.  Ex. 19 (Plaintiff 3) ("Problem with the stainless steel handle getting too hot when using the stove beneath").  Electrolux was provided an opportunity to inspect Ms. Rice's Microwave, and later falsely claimed the Microwave was improperly installed to deny her warranty relief. Ex. 20 (Plaintiff 8-13); Ex. 7 at 173:18-174:21 ("███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ .").  At this point in January 2014, Electrolux

12

admitted actual knowledge of the Handle Defect when the Microwave is installed pursuant to Electrolux's instructions.  Ex. 7 at 173:18-174:21; Ex. 6 at 93:15-19. After Electrolux rejected Ms. Rice's warranty claim on the false grounds of improper installation, she filed a Class Action Complaint on February 18, 2015. Plaintiff Gorczynski purchased his OTR Microwave afterwards, on May 16, 2015.

### 2. Electrolux Should Have Known of Handle Defect Prior to 2014

Electrolux has absolute access to the documents its product suppliers submit to UL for approval and represents it as "complete and accurate," including any testing performed on the Microwaves. Ex. 21 (UL 350-359) at 358.  In seeking initial UL approval, Sharp did not perform UL 923, Section 42 surface temperature testing because the microwave tested did not include a thermal element. Midea China, however, used a convection microwave oven for its UL testing so it performed the Surface Temperature Test under Section 42 on March 29, 2010. Ex. 22 (Midea_21-106) at Midea_63-66.  Although the UL 923 Surface Temperature Test only sets the burner to thirty percent from the cooktop below, Midea China observed and recorded the surface temperature of the Microwave handle to be

█████████████████.[3] *Id.* at Midea_65. Electrolux certified the accuracy of the data

---

[3] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Midea China submitted and undoubtedly knew based on Midea China's 2010 test that handle temperatures of ████████. Ex. 21.  Midea China's testing exceeded ASTM C1055 and put consumers at risk for burn injuries, especially considering this testing was done only at one-third power of the cooktop burner below or 3032 Btu/h. Ex. 22 at Midea_64; Ex. 16 at Section 42.4.2.3.

Nonetheless, Electrolux began selling the Microwaves with the Handle Defect  in the United States anyway.  On February 11, 2011, Electrolux received the first Handle Defect complaint that it recorded and preserved. Ex. 24 (call center complaints on CD) at Electrolux_3310. ████████████████████████████

████████████████████████████████████████████

████████████ Ex. 6 at 88:03-24. ████████████████████████████████████

████████████████████████████████████████████

████████████. *Id*. at 89:2-92:01. As the Handle Defect complaints continued, Electrolux shifted from providing relief under the warranty to creating defenses without ever examining the Handle Defect or its root cause.  Electrolux should have known of the Handle Defect long before admitting knowledge in January 2014, but it continued to suppress information about the Handle Defect from its past, present and future consumers. While complaints of the Handle Defect

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

continued to flow into Electrolux, it conducted no investigation of the Handle Defect.  *See, e.g.,* ECF No. 102, ¶9 (Electrolux admits in its Answer exemplar consumer complaints in Am. Complaint).

Internally at Electrolux, employees, large customers and others also raised concerns about the Handle Defect.  After the first class action alleging the Handle Defect was filed in February 2015, Electrolux continued to receive Handle Defect complaints while suppressing knowledge of the Handle Defect both internally and externally to its customers.  Three examples of this conduct follow here:

- .

- On August 11, 2015, two Electrolux employees expressed concern about using a metal replacement for a plastic handle given the known Handle Defect. Ex. 27 (Electrolux_42984).  One employee wrote, "we have been with consumers that state [the handle] gets hot and (even though we honor their word) after analysis we know it's not as hot as they state it's an ongoing topic of discussion, believe me." *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 28 (Dep. of Manuel Alexander Chakarji) at 36:09-37:08; Ex. 6 at 81:21-82:10. The other employee actually responded in disagreement, stating "from first hand experience I tested [the handle] once ***a few months ago and the one I did***

***get*** [sic] ***really hot*** ….” Ex. 27 (emphasis added); Ex. 29 (Dep. of Wesley Flowers) at 62:25-64:06.

- 

Electrolux continued to sell the Microwaves for “Over-The-Range” installation and provided no warning of the Handle Defect at the time of sale or during subsequent service calls. Ex. 6 at 111:13-112:15. Instead, Electrolux began a redesign of its microwave offerings and eliminated stainless steel handles for OTR microwaves. Ex. 6 at 46:19-48:01. By May 2016, after years of complaints, Electrolux advised Midea China, now its sole Microwave supplier, that: “[Electrolux] would prefer the plastic handle with PVT coating so we have less issue with handle temperature becoming hot fro [sic] cook top below.” Ex. 32 (Electrolux_42382-387) at Electrolux_42382); Ex. 33 (Dep. of Greg Gault) at 73:23-74:25.

### 3.   Electrolux Ignored the Handle Defect

Despite Electrolux’s admitted knowledge of the Handle Defect, Electrolux’s Corporate Designee acknowledged Electrolux did nothing, conducted no investigation, testing, or disclosure to consumers, including Class members:



Ex. 6 at 81:21-82:10. This admission from Electrolux came on November 19, 2019, years after Electrolux and UL confirmed the UL 923 Surface Temperature Tests of Section 42 was inapplicable to the Microwaves and Handle Defect.

### D. PLAINTIFF'S EXPERIENCE WITH THE MICROWAVE HANDLE

Plaintiff Gorczynski purchased a Frigidaire Gallery Over-The-Range Microwave Oven, Model No. FGMV154CLF from Defendant ABC Discount Appliances in New Jersey on May 16, 2015. Ex. 34 (Gorczynski 1); Ex. 35 (Dep. of Thomas Gorczynski) at 89:10-14.  His Microwave was properly installed over the range on May 19, 2015, pursuant to Electrolux's installation instructions. Ex. 36 at 90:23-91:24.  Plaintiff's Microwave handle began getting too hot to touch soon after the Microwave was installed over the range. Ex. 36 (Dep. of Jeanne Gorczynski) at 45:07-46:10.  Because of the Handle Defect, Mrs. Gorczynski uses a pot holder to open her Microwave. *Id.* at 65:13-17.  Similarly, guests and other members of the household are directed to use a pot holder when using the

Microwave when the cooktop is operating. *Id*. at 16:23-18:02.   Plaintiff commenced this class action on May 10, 2018. ECF No. 1-1, 2.

Plaintiff's expert, Daniel Farnan, observed and recorded actual temperature readings for Plaintiff's Microwave handle while the range was in operation. *See* Ex. 15.   On July 25, 2018, Mr. Farnan reported that the Microwave handle temperature reached 138°F. *Id*., ¶¶ 9-10. Mr. Farnan returned nearly a year later on July 23, 2019, and performed additional temperature measurements. The first test used a single pot to boil water, which yielded a surface temperature measurement of 151.8°F. *Id*., ¶¶15-16 (internal Exs. 7-9). Adding a second pot for Test 2 and boiling water in it, Mr. Farnan recorded the Microwave handle's temperature at 174.6°F. *Id*., ¶¶15, 17 (internal Exs. 7, 10-11). Finally, in removing all pots and operating a single burner on the range below for Test 3, Mr. Farnan recorded the handle temperature at 207.4°F. *Id*., ¶¶15, 18 (internal Exs. 7, 12-13). Each of these temperatures presents a risk of injury upon contact as set forth in the objective standards in ASTM C1055.  Ex. 13 at 10.

Electrolux has no factual basis to challenge the temperature measurements of Plaintiff Gorczynski's Microwave handle as reported by Mr. Farnan. Ex. 15, ¶¶ 9-18. Although Electrolux inspected Plaintiff's Microwave and home for several hours, it conducted no testing. Ex. 10 at 138:17-139:01. Indeed, Electrolux was

afforded a three-hour opportunity to test for the Handle Defect in Plaintiff Gorczynski's home and it chose not to do:



Ex. 10 at 145:16-146:05.

In fact, Electrolux never measured the temperature of Plaintiff's Microwave handle with any burner on more than half power. *Id.* at 136:22-137:09. Electrolux's own expert, Dr. Kytomaa, admitted "███████████████████████ ███████████████████" by Mr. Farnan. Ex. 10 at 143:19-144:07. Ultimately, Electrolux never sought to prove or disprove what temperature Plaintiff Gorczynski's Microwave handle reached as their expert Dr. Kytomaa, admitted: "███████████████████████████████████████████ ██████████████████████████." *Id.* at 149:15-20 (emphasis added). The temperature measurements of Plaintiff's Microwave handle observed and recorded by Mr. Farnan are undisputed.

### E.   THE CLASS SUFFERED DAMAGES

Both the NJCFA claim and breach of implied warranty of merchantability provide for a benefit-of-the-bargain measure of damages. Plaintiff submits an

economic loss model of damages attributable to the purchase of the Microwaves based on an empirical study and a Choice Based Conjoint Analysis ("Conjoint Analysis"). Ex. 37 (Expert Report of Stefan Boedeker).  As a result of this analysis, the economic loss to the Class has been calculated by Microwave model for a total damage figure of $32,842,077.00.  *Id*. at p. 53, Table 3.

Alternatively, Plaintiff also presents a damage model for replacing the Microwave handle with the Handle Defect.  *Id*., ¶¶150-157.  Electrolux admits the labor associated with replacing the Microwave handle is $91.00 each, which yields a labor damage amount of $7,379,190.00 for the proposed Class. *Id.*, ¶¶154-155; Ex. 8 at No. 12.  A replacement damage model is also provided using the retail price for replacement stainless steel handles as a proxy for aluminum replacement handles.  *Id*. , ¶156; Ex. 1 at No. 5.  Because the replacement stainless steel handles include the Handle Defect, a replacement handle must be valued using aluminum to eliminate the Handle Defect. *Id*. at ¶156; Ex. 4, ¶68 (noting a nearly 50°F decrease in temperature when only change is stainless steel to aluminum).  The aluminum raw material is nearly equal to the stainless steel cost, so the stainless steel replacement handle cost serves as a reasonable proxy to for aluminum handle replacement for calculating material costs in determining the benefit-of-the-bargain damages, including labor, to range between $15,289,519.50 and $19,744,604.10.  *Id*., ¶156.

## III.     THE CLASS DEFINITION IS ASCERTAINABLE

Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiff seeks to certify a Class under the New Jersey Consumer Fraud Act defined as: All persons who purchased a Microwave in New Jersey from May 10, 2012 to the present.  Plaintiff also seeks to certify a Class under New Jersey's implied warranty of merchantability and the Magnuson-Moss Warranty Act, which is subsumed in the Class due to the shorter class period beginning May 10, 2014.

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc*., 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).  Ascertainability serves to ensure the proposed class will function as a class and focuses on whether persons fitting the class definition may be identified without resort to mini-trials. *Id.* 784 F.3d at 162, 164-65.  "However, plaintiff need not be able to identify all class members at class certification – instead, *a plaintiff need only show that class members can be identified*." *City Select Auto Sales, Inc. v. BMW Bank of N.A., Inc*., 867 F.3d 434, 441 (3d Cir. 2017) (internal quotations and citations omitted) (emphasis added).

### A.     THE CLASS IS DEFINED USING OBJECTIVE CRITERIA

Class membership is defined as (i) a purchaser (ii) of one of the defined Microwaves (iii) in New Jersey (iv) since May 10, 2012. Rule 23 does not require an objective way of determining class membership, only that the be "objective criteria" for class membership. *City Select Auto Sales, Inc.*, 867 F.3d at 441. The Class is defined exclusively using objective criteria, so the ascertainability inquiry is readily satisfied.

### B. RELIABLE AND ADMINISTRATIVELY FEASIBLE MEANS EXIST TO IDENTIFY THE CLASS

Each objective criterion necessary to establish membership in the Class can be accomplished in a reliable and administratively feasible manner. "Plaintiff need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership." *City Select Auto Sales, Inc.*, 867 F.3d at 441. Instead, affidavits in combination with other records or reliable and administratively feasible means satisfies the ascertainability standard. *Id.* Each of the elements necessary to establish membership in the Class is readily established by a sales receipt or purchase documents for the Microwave. *See e.g.*, Ex. 34. The purchase documents indisputably identify the purchaser, the date of purchase, the Microwave by model and the location of the purchase. And to the extent additional data was needed, an affidavit from a consumer can easily be cross referenced against sales data from the particular seller tracked by Electrolux, such as the records Plaintiff obtained by subpoena from Electrolux's retailers, as "a

method to weed out unreliable affidavits." *City Select Auto Sales, Inc.*, 867 F.3d at 441 (quoting *Byrd*, 784 F.3d at 171).  The Microwave model and serial number, along with its date of its manufacture, is clearly imprinted on Microwave itself. Ex. 38 (Photograph of Plaintiff's Microwave, produced by H. Kytomaa).

This should be sufficient to establish a reliable and administratively feasible method to demonstrate the objective criteria necessary for class membership. Plaintiff, however, offers additional evidence to the Court.  Electrolux distributed approximately 81,000 Microwaves in New Jersey with the large majority of those sales through its large retail network. Ex. 1 at No. 1; Ex. 39 (Electrolux's Fifth Supp. Obj. and Resp. to Interrogatories) at No. 8.  Plaintiff has already reliably identified nearly half the class – ██████ members of the proposed class – by name, address, Microwave model number and purchase date and location through four subpoenas on several of Electrolux's large retail customers. *See* Ex. 40 (PC Richards Subpoena Resp. on CD); Ex. 41 (Lowes Subpoena Resp. – on CD); Ex. 42 (Best Buy Subpoena Resp.); Ex. 43 (Pacific Sales Subpoena Resp.). This same data establishes class membership, and can be used to disprove class membership where necessary as the Third Circuit contemplated in *Byrd* and its progeny.

## IV.  THE REQUIREMENTS FOR RULE 23 CERTIFICATION ARE SATISFIED

Class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S.

797, 809 (1985).  In addition to establishing satisfaction of the four prerequisites of Rule 23(a), Plaintiff must also demonstrate that at least one of the three requirements listed in Rule 23(b) is met. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  This Court ultimately has "broad discretion" over whether to certify a class. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig*., 722 F.3d 838, 850 (6th Cir. 2013), *cert. denied sub nom, Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014).

Although the Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' ... Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  Thus, "[m]erits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195; *see also Gonzalez v. Corning*, 885 F.3d 186, 200-201 (3d Cir. 2018).  "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Gonzalez*, 885 F.3d at 192.

A. **THE CLASS MEETS THE RULE 23(A) REQUIREMENTS**
   1. **The Class is Sufficiently Numerous**

Numerosity is satisfied where "the class is so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  The Third Circuit does not set

24

any strict numerical test, but "[g]enerally, if the named plaintiff demonstrates the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-227 (3d Cir. 2001). *See also, In re Modafinil Antitrust Litig*., 837 F.3d 238, 249–50 (3d Cir. 2016), as amended (Sept. 29, 2016); *Schwartz v. Avis Rent-A-Car System, LLC*, 2014 WL 4272018 at * (D.N.J. Aug. 28, 2014). "To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." *Varacallo v. Massachusetts Mut. Life Ins. Co*., 226 F.R.D. 207, 229 (D.N.J. 2005) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 507 (D.N.J. 1997) *aff'd sub nom. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998).

Since January 2012, Electrolux shipped over 80,000 of the Microwaves to retailers located in New Jersey. Ex. 1 at No. 1. The vast majority of Electrolux's Microwave sales are centralized among its seven largest retail customers, including PC Richards, Lowes and Best Buy. Ex. 39 at No. 8. Plaintiff served subpoenas on several of these large retail customers, and the response from PC Richards alone identified 25,890 members of the proposed Class along with their names and addresses throughout New Jersey. *See* Ex. 40 (on CD); *see also*, Ex. 41 (on CD) (identifying ████ class members); Ex. 42, ¶9 (identifying 4,889 class members).

25

The Microwave sales occurred throughout New Jersey and "common sense" dictates joinder of these tens of thousands of class members is impracticable. Numerosity is therefore satisfied.

      **2.**    **Plaintiff and Class Members Share Common Questions of Fact and Law**

Commonality is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality is satisfied when there are classwide answers." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015) (citations omitted). Even a single common question will do; commonality "does not require perfect identity of questions of law or fact among all class members." *Id*. at 486. "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Id*. (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir.2013) (internal quotation marks omitted)). Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). "Their claims must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the

lawsuit." *In re Whirlpool Corp.*, 722 F.3d at 852 (internal quotations and citations omitted); *see also Rikos v. Procter & Gamble*, 799 F.3d 497, 505 (6th Cir. 2015) *cert. denied*, 136 S. Ct. 1493 (2016) (same).

Commonality is readily satisfied where the claims at issue arise from a defective design that exists in each manufactured product. Every Microwave is represented as an "Over-The-Range" Microwave despite its handle including the Handle Defect. Ex. 6 at 19:08-12; Ex. 4, ¶73. Similarly, the geometrical, physical and thermal properties for the Microwaves' handles are nearly identical giving rise to the Handle Defect when heat from the cooktop is applied. Ex. 4 at Figure IVB-3, Appendix C. Because these conditions are present in each handle, they are sold with the same latent Handle Defect. *See In re Whirlpool Corp.*, 722 F.3d at 854 (commonality existed where defendant's internal documents confirmed that defendant's various models of washing machines had the same design flaw that allegedly led to mold growth).

Class members' claims rise or fall on the resolution of several common issues. *First*, whether the Handle Defect exists in the Microwaves; *second*, whether and when Electrolux knew of the Handle Defect without disclosing it and continuing to misrepresent the Microwaves as "Over-The-Range"; *third*, whether Electrolux can rely on UL 923, Section 42 to challenge the Handle Defect exists; and *fourth*, whether Electrolux's uniform warranty language seeking to modify the

implied warranty of merchantability is sufficiently clear and conspicuous to be effective. Resolution of these issues are common to each member of the Class, and rely on the same evidence to prove or disprove each question presented for the Court or jury. Because "[c]ommon proof will advance the litigation by resolving this issue 'in one stroke' for all members of the class," Rule 23(a)(2) is easily satisfied. *In re Whirlpool*, 722 F.3d at 855.

### 3. Plaintiff's Claims are Typical of the Class Members' Claims

Typicality demands that the named plaintiffs' claims be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). As the Supreme Court indicated in *Dukes*, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5. The typicality requirement is generally satisfied where there is a strong similarity of legal theories, especially when the claims of the class representative and class members arise from the same alleged course of conduct by the defendant. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 518.

Plaintiff's NJCFA and breach of warranty claims arise from Electrolux's knowledge of the Handle Defect, choice to suppress that knowledge, misrepresentation of the Microwaves as "Over-The-Range" and the benefit-of-the-bargain damages resulting from Electrolux's conduct. Plaintiff was exposed to the Electrolux's same conduct relating to his Microwave and the Handle Defect upon

which his and every Class member's claim is based.  And Electrolux largely asserts the same defense to Plaintiff's claims as it would each other class members' claims; it contends no Handle Defect exists because the Microwaves comply with UL 923, Section 42 and the statute of limitations for the implied warranty claim is limited to 1 year.  These claims and defenses apply uniformly to Plaintiff and the Class.  Typicality is satisfied.

### 4.    There is Fair and Adequate Representation

In order to certify a class, the court must also find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "The adequacy of representation inquiry has two components intended to assure that the absentees' interests are fully pursued: it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class." *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 800 (3d Cir. 1995); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. at 519 ("There are two factors: (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class.").

Plaintiff and the Class share common interests, asserted through the same legal claims based on the presence of the Handle Defect and the false claim that the

29

Microwave is proper for use "Over-The-Range."   No conflict or antagonistic interests between Plaintiff and absent members of the Class exist. All putative class members are purchasers of Microwaves misrepresented as "Over-The-Range" Microwaves with the undisclosed Handle Defect admittedly known to Electrolux. To the extent the Handle Defect is proven to violate the NJCFA, the ascertainable loss occurs at the point of sale and is recoverable by Plaintiff and the proposed Class.

Plaintiff Gorczynski purchased OTR Microwave model FGMV154CLF with Handle Part No. 5304481502 on May 16, 2015, and has standing to represent the proposed Class to include all Microwaves as defined above.   The preferred standing analysis on the unpurchased product issue in the Third Circuit does not turn on whether plaintiff purchased the particular microwave models, but rather the extent of the similarity between the Microwaves and the claims alleged.  *See Neuss v. Rubi Rose, LLC*, 2017 WL 2367056, at *5 (D.N.J. May 31, 2017); *In re In re Gerber Probiotic Sales Practices Litig.*, 2014 WL 5092920, at *6-8 (D.N.J. Oct. 10, 2014)).   As this Court has found, "a plaintiff may have standing to assert claims on behalf of putative class members regarding products they did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants."  *Cannon v. Ashburn Corp.*, 2016 WL 7130913, at *4 (D.N.J. Dec. 7, 2016) (Bumb, J.) (citing

*Stewart v. Smart Balance, Inc.*, 2012 WL 4168584, at *16 (D.N.J. June 26, 2012), *In re Gerber Probiotic Sales Practices Litig.*, 2014 WL 5092920, at *5-6; *see Neuss,* 2017 WL 2367056, at *5.  All three criteria are readily satisfied here.

*First*, the Handle Defect is alleged to exist in each handle of the Microwaves that have nearly identical design and without any substantive engineering difference.  *See* Ex. 4, ¶73, Figure IV-3.  *Second*, the Microwaves are all Frigidaire Gallery OTR Microwaves with stainless steel handles that are nearly identical in design, geometry and thermal properties.  *Id.*, Figure IV-3.  *Third*, Electrolux distributes all the Microwaves, and the proposed Class asserts the same legal claims based on the Handle Defect and OTR misrepresentation for all Class Members.  *See In re Whirlpool Corp.*, 722 F.3d at 857 (affirming adequacy finding where named plaintiffs with moldy washers sought to represent a putative class of both moldy and non-moldy washer owners with different model numbers).

Plaintiff has demonstrated his commitment to prosecuting the case vigorously, having fully participated in discovery.  Further, Plaintiff retained experienced and qualified counsel who are protecting the interests of the class. Plaintiff's counsel is highly experienced and has successfully acted as representative counsel in numerous class actions.  *See* Ex. 44 (SMB Resume). The adequacy requirement is met.

**B.    THE CLASS MEETS THE REQUIREMENTS OF RULE 23(B)(3)**

**1.    Common Questions of Law and Fact Predominate Over Questions Affecting Only Individual Class Members**

Plaintiff requests this Court certify the Class pursuant to Rule 23(b)(3), which requires that common questions of law or fact predominate over questions that affect only individual members of the class, and a class action must be found to be superior to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3). "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen*, 133 S. Ct. at 1191 (quoting Fed. R. Civ. P. 23(b)(3)).  Rule 23(b)(3) class actions are designed to "cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal alterations/quotations omitted).

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  A class that is "entirely cohesive … will prevail or fail in unison." *Amgen*, 133 S. Ct. at 1191.  The court must scrutinize the relationship between common and individual questions in a case. *Tyson Foods*, 136 S. Ct. at 1045.  A common question "is one where the same

evidence will suffice for each member to make a prima facie showing" or where "the issue is susceptible to generalized, class-wide proof." *Id.* at 1045. "A plaintiff class need not prove that each element of a claim can be established by classwide proof: What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members." *In re Whirlpool Corp.*, 722 F.3d at 858 (emphasis in original; internal quotation marks and citation omitted). Or as stated by the Supreme Court, "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (internal quotations omitted).

In this case, the same latent design defect in the Microwaves' handles that existed at the time of sale is alleged for Plaintiff and the Class. Because the Microwaves' handles are all manufactured as hollow tubes of stainless steel with thin walls intended for use "Over-The-Range," they heat to temperatures that violate ASTM C1055 due to heat radiating up from the cooktop below. Ex. 4, ¶¶73, 77, Figure VI-4; Ex. 15, ¶¶10, 16-17; Ex. 13 at 10-11. Each of the Microwaves' handles share nearly identical geometry, physical and thermal properties. Ex. 4 at Figure IV-3, Appendix C. As such, each Microwave handle

reacts nearly identically to heat from the cooktop below resulting in temperatures ranging from 135.8°F to 149.9°F under the same conditions. Ex. 4, ¶73.

The central, predominating issue is whether this Handle Defect exists. The common evidence and issues relied upon to support and challenge the asserted legal claims predominate over any individualized issue. The inquiries as to Electrolux's knowledge of the Handle Defect and its "Over-the-Range" representation to Class members focus on Electrolux's conduct and are the same for all Class members. These same facts will drive the liability determination under the NJCFA and implied warranty of merchantability under New Jersey law for all and resolve these claims in one stroke. Courts in this and other circuits have routinely found that an issue such as this predominates over individual issues to warrant Rule 23(b)(3) certification. *See, e.g., Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *21 (D.N.J. Dec. 20, 2017) (certifying plaintiffs' class on the price-premium theory of injury as against defendant Whirlpool under NJCFA and implied warranty); *In re Whirlpool Corp.*, 722 F.3d at 859 ("[W]e uphold the district court's determination that liability questions common to the Ohio class— whether the alleged design defects in the Duets proximately caused mold to grow in the machines and whether Whirlpool adequately warned consumers about the propensity for mold growth—predominate over any individual questions."); *Daffin*, 458 F.3d at 554 (affirming class certification after finding that the issue of

"whether the throttle body assembly is defective" predominated over individual issues; "[T]his is not a case … in which different class members were exposed to different products such that the uncommon issue of causation predominated over the lesser shared issues."); *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010) ("[T]he common predominant issue of whether the windows suffer from a single, inherent design defect leading to wood rot is the essence of the dispute and is better resolved by class treatment.").

### a)     New Jersey Consumer Fraud Act

The NJCFA imposes liability on any person who uses: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission."  N.J.S.A. § 56:8-2.  Claims under the NJCFA are divided broadly "into three ... categories: affirmative acts, knowing omissions, and regulatory violations." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 17 (1994).  The elements of a NJCFA claim are "(a) an unlawful conduct by the defendant; (b) that the plaintiff suffered an ascertainable loss; and, (c) a causal connection between defendant's unlawful conduct and plaintiff's ascertainable loss." *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc*., 192 N.J. 372, 389 (N.J. 2007) (quoting N.J.S.A. § 56:8-2).  A six-year statute of limitations applies to

NJCFA claims, so the requested class period begins six year prior to the filing of the initial complaint, May 10, 2012.  *See* N.J.S.A. § 2A:14–1; *DiIorio v. Structural Stone & Brick Co.*, 368 N.J. Super. 134, 142 (App. Div. 2004).

### (i)      Electrolux's Unlawful Conduct

Plaintiff's   NJCFA   claim   arise   from   Electrolux's   affirmative misrepresentation that the Microwaves properly function as "Over-The-Range," and a knowing omission in Electrolux's conscious choice not to disclose the Handle Defect.

### (a)      Electrolux misrepresents Microwaves as "Over-The-Range"

An affirmative misrepresentation under the NJCFA is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase."  *Chaudhri v. Lumileds LLC*, 2018 WL 6322623, at *6 (D.N.J. Dec. 3, 2018) (quoting *Mango v. Pierce-Coombs*, 370 N.J. Super. 239, 250-51 (App. Div. 2004)).  "When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Cox*, 138 N.J. at 17-18.  "Unlike common law fraud, the NJCFA does not require proof of reliance."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012).  "One who makes an affirmative misrepresentation is liable even in the

absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (N.J.1997).

An "Over-The-Range" Microwave is designed and manufactured to serve a particular purpose, which is to function over an operable cooktop. Ex. 3 at Appendix 3 (Electrolux_3232); Ex. 2 at Electrolux_2990. Every Microwave purchased by the Class is affirmatively represented as an "Over-the-Range" Microwave to be installed on a vertical wall directly over the cooking surface. ECF No. 102, ¶¶1-2; Ex. 6 at 19:4-12. In addition to the Microwaves' exterior packaging stating the Microwave is an "Over-the-Range" Microwave, the Installation Instructions detail instructions only for installing the Microwaves only over a cooktop or range. ECF No. 26-1. Electrolux does not limit the Microwaves' installation to be over any particular range or cooktop, and Electrolux has never warned or disclosed the Handle Defect. Ex. 8 at No. 14; Ex. 6 at 108:19-109:7; 112:2-113:14. The Microwave models are separately designated as "Microwave ovens, over-the-range." Ex. 45 at Electrolux_3044-45. The existence of the Handle Defect makes the "Over-The-Range" representation false and misleading in violation of the NJCFA for Plaintiff and Class members.

### (b)   Electrolux Concealed the Handle Defect

A plaintiff asserting a claim based on an omission must demonstrate that the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that

plaintiff rely upon the concealment." *Coba v. Ford Motor Co.*, 932 F.3d 114, 124 (3d Cir. 2019) (quoting *Judge v. Blackfin Yacht Corp.*, 357 N.J.Super. 418, 815 A.2d 537, 541 (2003)).  "Implicit in the showing of an omission is the underlying duty on the part of the defendant to disclose what he concealed to induce the purchase." *Id.*  "New Jersey law is clear that a duty to disclose is implied where such disclosure is necessary to make a previous statement true."  *Francis E. Parker Memorial Home, Inc. v. Georgia-Pacific LLC*, 945 F. Supp. 2d 543, 560 (D.N.J. 2013) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993)).

Electrolux admits to actual knowledge of the Handle Defect prior to Plaintiff's Microwave purchase in May 2015. Ex. 6 at 93:15-19 ("███████

███████████████████████████████████████

███████████████████████████████████████

███████████").  Electrolux has maintained a willful blindness to the Handle Defect and the fact it existed where Microwaves were properly installed, both before receiving the Rice complaint and after.  It ignored complaints about the Handle Defect dating back to February 2011 from consumers, and disregarded concerns raised by large national customers in 2015 and 2016 to the point the Microwaves were pulled from product offerings of a national builder. *See supra* at II.C.2.  At no time did Electrolux or its supplier make any effort to identify the root

cause or understand why the Handle Defect existed in its Microwaves, but not in its competitors' microwaves like General Electric.

Information is "material" when "a reasonable person would attach importance to its existence in determining his or her choice of action." *Coba,* 932 F.3d at 125–26 (quoting *Suarez v. E. Int'l Coll*., 428 N.J.Super. 10, 50 A.3d 75, 89 (2012)).  The Handle Defect impairs the only means of opening the Microwave and is essential to a consumer's use of the Microwave. Ex. 9 at No. 28; Ex. 10 at 45:3-6.  The importance of the Handle Defect to a purchasing consumer was measured as part of the empirical survey and study conducted by Mr. Boedeker. Ex. 37, ¶59 ("the relevant question to determine economic loss is if the disclosure of the Handle Defect at the point of purchase makes the Electrolux Microwaves sold inferior in the eyes of the consumer to the point that the demand curve would shift downward.).  The Handle Defect was of such import that if Electrolux had disclosed it prior to sale, there would be a dramatic decrease in demand for the Microwaves.  *Id.*, ¶¶45-47, 139 ("The fact that the demand curve connecting the orange dots has shifted downwards proves that the microwave oven becomes less desirable when the Handle Defect is disclosed."), ¶140 ("In a but-for world where the consumer is told about the Handle Defect, the levels of the attributes change at the point of purchase, the at-issue Frigidaire microwave ovens become less

attractive to consumers and the demand curve shifts downward."). The Handle Defect is material to the consumer's decision to purchase the Microwaves.

### (ii)   **Plaintiff and the Class Suffered an Ascertainable Loss**

"The New Jersey Supreme Court has repeatedly and explicitly endorsed a benefit-of-the-bargain theory under the Consumer Fraud Act that requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." *Smajlaj v. Campbell Soup Co.*, 782 F.Supp.2d 84, 99 (D.N.J. 2011) (citing *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 872 A.2d 783, 792 (N.J. 2005)); *Furst v. Einstein Moomjy, Inc*., 182 N.J. 1 (N.J. 2004). The difference in value between the product received and the product promised is a valid measure of damages in a benefit-of-the-bargain NJCFA claim, as well as a "calcula[tion of] the difference by reference to the market price of making the product actually received like the one warranted, either by modification or replacement." *Id*. at 102. The valuations "need only provide a reasonable basis for valuation that is not speculative or unquantified," they "do not have to be perfect." *Id.* at 102-103. Ascertainable loss under the NJCFA does not require an alleged defect to manifest to recover under the NJCFA. *See In re General Motors LLC Ignition Switch Litig.*, 339 F.Supp.3d 262, 282-283 (S.D.N.Y. 2018); *Strzakowlski v. Gen. Motors Corp*., 2005 WL 2001912, at *2, *7 (D.N.J. Aug. 16, 2005); *Thiedemann*, 183 N.J. at 252, n.8

(citing *Talalai v. Cooper Tire & Rubber Co.*, 360 N.J. Super. 547, 564 (Law. Div. 2001) (rejecting argument that "a product defect that has not manifested itself is not a claim for which a court can provide relief" under the NJCFA)).  As such, the elements necessary to establish the NJCFA claim for Plaintiff and the Class are complete at the time of purchase.

Plaintiff presents a damages theory based on a Conjoint Analysis, conducted by Microwave model, to support classwide damages of $32,842,077.00, which is easily distributed to class members on a by model purchased basis. Ex. 37, ¶¶148-149, Table 3.  Further, Plaintiff presented an alternative class wide damage model based on replacement of the Microwaves' handle with a non-defective handle made of aluminum. *Id.*, ¶156. The replacement model presents replacement damages under a benefit-of-the-bargain approach between $15,289,519.50 and $19,744,604.10.  *Id.*  Both damage models are directly tied to the Handle Defect and provide Plaintiff and the Class the benefit for which they bargained when purchasing the Microwave:  a handle that can be safely used during operation of the cooktop below.

### (iii)   Electrolux's Unlawful Conduct Caused the Ascertainable Loss

Electrolux's knowing omission of the latent Handle Defect and false representation that the Microwaves are suitable as "Over-The-Range" microwaves caused Plaintiff and the Class's ascertainable loss.  *First*, for the knowing omission

of the Handle Defect, the Third Circuit has set forth the following analysis to determine whether common issues predominate over individual ones on the issue of causation, so the Court must find:

> [E]ither (1) that the alleged [omissions] were not knowable to a significant number of potential class members before they purchased … [the product], or (2) that, even if the [omissions] were knowable, that class members were nonetheless relatively uniform in their decision-making, which would indicate that, at most, only an insignificant number of class members actually knew of the alleged [omissions] and purchased … [the product] at the price they did anyway.  These findings cannot be side-stepped.  They are necessary to determine whether the predominance requirement is met in this case.

*Marcus*, 687 F.3d at 610.  Although Plaintiff can satisfy both *Marcus* factors, only one is necessary and the first factor is easily satisfied by common evidence.

The Handle Defect was not knowable to a significant number of Class members before they purchased, and is alleged to exist as a latent defect in the handle of every Microwave sold.  It is undetectable prior to installation over the range and before the heat from that range below radiates upward to heat the razor thin, hollow stainless-steel handle. Ex. 4, ¶77. Electrolux's corporate designee admitted "███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████" Ex. 6 at 115:04-116:03. Further, Electrolux never disclosed or warned of the Handle Defect despite admitting actual knowledge of the alleged Handle Defect by 2014. Ex. 46

at No. 14; Ex. 6 at 93:15-19. Ultimately, Electrolux's Corporate Designee acknowledged complete responsibility for making consumers aware of the Handle Defect. Ex. 6 at 116:-8-14 ("███████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████").   This evidence is focused on Electrolux's conduct and common to the Class.  Thus, the Court can easily and readily conclude the first *Marcus* prong is satisfied, and the Handle Defect was "not knowable to a significant number of potential class members[.]"  *Marcus*, 687 F.3d at 610. Common issues predominate as to causation for the NJCFA claim of the Class.

       **b)**    **New Jersey Implied Warranty of Merchantability and Magnuson-Moss Warranty Act**

Plaintiff also seeks class certification pursuant to New Jersey's implied warranty of merchantability and the Magnuson-Moss Warranty Act.  New Jersey has adopted U.C.C. § 2-314, which is codified at N.J. Stat. Ann. § 12A:2-314.  As courts have repeatedly recognized, implied warranty claims are readily certifiable in design defect cases such as the Handle Defect.  *See, e.g., In re Whirlpool Corp.*, 722 F.3d at 853 (affirming class certification of implied warranty claim arising from latent washing machine defect); *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *25 (N.D. Cal. Sept. 14, 2016) (certifying breach of implied warranty of merchantability under New Jersey Law arising from defective

43

automobile system), on reconsideration in part, 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016); *In re Zurn Pex Plumbing Prod. Liab. Litig*., 644 F.3d 604, 617-18 (8th Cir. 2011) (affirming class certification of implied warranty claims arising from a latent defect in plumbing fittings); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) (reversing denial of class certification after finding that common issues predominated with respect to implied warranty claim that arose from alleged latent alignment defect).

"[T]he UCC, as adopted by New Jersey, specifically states that an implied warranty of merchantability ensures that goods sold are fit for the ordinary purposes for which such goods are used." *Dzielak v. Whirlpool Corp*., 2019 WL 6607220, at *16 (D.N.J. Dec. 5, 2019) (quoting *Arlandson v. Hartz Mountain Corp*., 792 F. Supp. 2d 691, 706 (D.N.J. 2011)); *see also* N.J.S.A. § 12A:2-314. To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." N.J.S.A. § 12A:2-314 (2)(c) and (f).  "Merchantability is defined as the product sold should be of the general kind described and reasonably fit for the general purpose for which it should have been sold." *Id*. (citing *Lieberson v. Johnson & Johnson Consumer Companies, Inc*., 865 F. Supp. 2d 529, 542 (D.N.J. 2011)) (internal quotations and citations omitted).  A product is unfit for its ordinary purpose "when it can identify one of three general types of defects:

44

manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods." *Id.* "The 'ordinary purpose' of a product is one that is central to the product's value or function." *Id.* "This test for defects is essentially the same as that required when the theory is strict tort liability under Section 402A of the Restatement (Second) of Torts, except that goods may violate the implied warranty of merchantability without being "unreasonably dangerous," as is generally required under strict tort." *Id.* (quoting *Lieberson*, 865 F. Supp. 2d at 542) (internal quotations omitted).

The issue of whether the Microwaves are not merchantable because of the Handle Defect is a common issue that drives the resolution of Plaintiff's implied warranty of merchantability claim. If the Handle Defect is found to exist, Electrolux will have breached its implied warranty of merchantability to Plaintiff and the Class. "If each [product] version is similarly flawed, it follows that each would breach (or not) the [implied warranty of merchantability] in materially the same way." *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *25. Similarly, Electrolux challenges the applicable statute of limitations for this warranty claim based on uniform language, and the enforceability determination of that provision by this Court applies to all members of the Class.

Electrolux presented a common defense to the implied warranty of merchantability claim for all class members, and the resolution of that defense is

again premised on common evidence.  ECF No. 102, p. 21 (Eighteenth Affirmative Defense).  Electrolux argues that it has reduced the four-year statute of limitations for the implied warranty claim to one year based on uniform language appearing at the end of its Use and Care Guide.  This modification must be clear and conspicuous pursuant to N.J.S.A. §12A:2-316.  *See New Jersey Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 328 (3d Cir. 2007); *Gorczynski v. Electrolux Home Prod., Inc.*, 2019 WL 5304085, at *4-5 (D.N.J. Oct. 18, 2019).  This defense is based on facts and law common to all Class members, including Plaintiff.

Common issues predominate in resolving Plaintiff's New Jersey implied warranty of merchantability and MMWA claims for the Class.

### c) Plaintiff's Damages Model Shows Common Harm and Classwide Damages

Plaintiff and the Class may recover under the benefit-of-the-bargain measure of damages under either the NJCFA or implied warranty of merchantability claims. *Smajlaj*, 782 F.Supp.2d at 101-102.  Commonality of damages is not required to certify a class action. *Tyson Foods*, 136 S. Ct. at 1045.  "Because recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal, in the mine run of cases, it remains the black letter rule that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members." *In re Whirlpool Corp.*, 722 F.3d at 861 (quoting *Comcast Corp.*

46

*v. Behrend*, 133 S. Ct. 1426, 1437 (2013) (Ginsburg, J., Breyer, J., Sotomayor, J. and Kagan, J., dissenting)); *see also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.") (internal quotations and citations omitted).  So long as the damages can be attributed to Plaintiff's theory of liability, damage calculations for individual class members will not defeat certification.  *See Comcast*, 569 U.S. at 35.

Plaintiff's damages expert, Stefan Boedeker, proposed two alternative damages models, both tied to Plaintiff's legal theory that they did not receive what they paid for when they purchased their Microwaves, thus satisfying the *Comcast* standard. As discussed above, the first damages model determines the price premium associated with the Handle Defect using a choice-based conjoint study conducted by Mr. Boedeker.  The conjoint study was designed to assess the reduction in market value of the Microwaves resulting from the Handle Defect. Ex. 37 at ¶¶10-11.  This was done by conducting a scientifically-designed conjoint survey and Conjoint Analysis that found the decrease in demand (and resulting shift of the demand curve) associated with the undisclosed Handle Defect in the Microwaves.  *See generally,* Ex. 37 at ¶¶123-138. The Conjoint Analysis determined, based on the change in the demand curve, that the median economic loss was approximately 112.1% of the median Microwave price, essentially

showing that consumers would not have purchased the Microwave had they known of the Handle Defect at the point of sale. *Id.* at ¶¶139-143. This damage model therefore tracks Plaintiffs' theory of liability as required by *Comcast*.[4]

In addition, Mr. Boedeker presents an alternative damages model that also fits Plaintiff's theory of liability that he and the Class did not receive the Microwave they believed they had purchased. Under this alternative model, Mr. Boedeker calculates class damages based on the cost of providing a replacement handle that does not have the Handle Defect. Ex. 37, ¶¶150-158. This again satisfies *Comcast* and provides an alternative damages methodology should the Court not accept Mr. Boedeker's conjoint study.

Under either theory of liability, Plaintiff and the Class will be entitled to benefit-of-the-bargain damages if successful. The damage models presented are tied directly to the Handle Defect and Electrolux's failure to disclose or remediate it. *See* Ex. 37, ¶¶148, 156, Table 3.

---

[4] *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *6 (D.N.J. Mar. 17, 2017) ("Conjoint analysis has won acceptance from courts and legal commentators"); *id.* (citing *ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) (acknowledging that "marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences," and holding that conjoint analysis is sufficiently reliable to be used to calculate class-wide damages).

## C.  THIS CLASS ACTION IS A MANAGEABLE AND SUPERIOR METHOD OF ADJUDICATION

Rule 23(b)(3) sets forth the factors to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  These factors include:  (i) the class members' interest in individually controlling separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

The Rule 23(b)(3) "superiority" factors weigh heavily in favor of certification here.  The value of the claims of several class members is too small to justify individual litigation.  "Use of the class method is warranted particularly because class members are not likely to file individual actions – the cost of litigation would dwarf any potential recovery."  *In re Whirlpool*, 722 F.3d at 861.  A class action is considered to be superior where individual class members have little interest in individually controlling the prosecution or defense of separate actions because each consumer has a very small claim in relation to the cost of prosecuting the lawsuit.  *See In re Remeron End-Payor Antitrust Litig*., 2005 WL 2230314, at *12 (D.N.J. Sept. 13, 2005).  Thus, "[i]t is far more efficient to litigate this action in one case, rather than many (or more likely, zero individual suits because of litigation costs)."  *Rikos v. Procter & Gamble Co.*, 2014 U.S. Dist.

LEXIS 109302, at *55 (S.D. Ohio June 19, 2014) (internal citations omitted), *aff'd*, 799 F.3d 497 (6th Cir. 2015).

Superiority is easily met here. It is not economically feasible for individuals to pursue individual lawsuits against Electrolux, thereby leaving aggrieved persons without any effective redress for the Handle Defect. *See, e.g., Reyes*, 802 F.3d at 492 ("class actions have the practical effect of allowing plaintiffs who have suffered relatively de minimis loss to nevertheless function as private attorneys general and thereby deter fraud in the marketplace."). Allowing the claims of Plaintiff and thousands of Class members here to be resolved in one stroke eliminates potentially inconsistent rulings and conserves judicial resources.

## V.    CONCLUSION

The Handle Defect and the damages flowing from Electrolux's knowing omission and misrepresenting the Microwaves as "Over-The-Range" will either succeed or fail on evidence common to all Class members. Accordingly, Plaintiff requests that the Court certify the Class of New Jersey Microwave purchasers since May 2012 to assert claims brought under the NJCFA, New Jersey law for breach of the implied warranty of merchantability, and the MMWA. Further, Plaintiff requests that the Court appoint Saltz, Mongeluzzi & Bendesky, P.C. as Class Counsel and appoint Plaintiff Gorczynski to represent the Class.

Respectfully submitted,

DATE:  March 27, 2020                      By: */s/ Simon B. Paris*
                                           Simon B. Paris
                                           Patrick Howard (PA ID #88572)
                                           Charles J. Kocher (PA ID #93141)
                                           SALTZ, MONGELUZZI,
                                           & BENDESKY, P.C.
                                           1650 Market Street, 52nd Floor
                                           Philadelphia, PA 19103
                                           Telephone: (215) 496-8282
                                           Fax: (215) 496-0999
                                           sparis@smbb.com
                                           phoward@smbb.com
                                           ckocher@smbb.com
                                           **Attorneys for Plaintiff and
                                           Proposed Class**