[Docket Nos. 109, 138, 193, 194]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| THOMAS GORCZYNSKI, | |
| Plaintiff, | |
| v. | Civil No. 18-10661 (RMB/MJS) |
| ELECTROLUX HOME PRODUCTS, INC., *et al.*, | **OPINION** |
| Defendants. | (***Filed Under Temporary Seal***) |

**APPEARANCES:**

SALTZ MONGELUZZI BARRETT & BENDESKY, P.C.
By: Patrick Howard and Simon Bahne Paris, Esqs.
One Liberty Place, 1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103

GUSTAFSON GLUEK PLLC
By: Daniel E. Gustafson, Esq.
Canadian Pacific Plaza, 120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402

*On behalf of Plaintiff Thomas Gorczynski (and others similarly situated)*

K&L GATES LLP
By: Patrick J. Perrone and Loly G. Tor, Esqs.
One Newark Center, 10th Floor
Newark, New Jersey 07101

K&L GATES LLP
By: Michael S. Nelson, Esq.
K&L Gates Center, 210 Sixth Avenue
Pittsburgh, Pennsylvania 15222

*On behalf of Defendant Electrolux Home Products, Inc.*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon two motions to preclude expert testimony in this products liability action.  On April 24, 2020, Defendant Electrolux Home Products, Inc. ("Defendant") filed a motion to preclude the expert opinion of Dr. Michael Bak.  [Docket No. 109 (the "Bak Motion").]  On May 29, 2020, Plaintiff Thomas Gorczynski ("Plaintiff") filed a motion to preclude the expert opinion of Dr. Harri Kytomaa.  [Docket No. 138 (the "Kytomaa Motion").]  Plaintiff filed his Opposition to the Bak Motion on May 29, 2020, [Docket No. 133], and Defendant filed its Reply Brief on June 26, 2020, [Docket No. 144].  Defendant filed its Opposition to the Kytomaa Motion on June 19, 2020, [Docket No. 141], and Plaintiff filed his Reply Brief on July 7, 2020, [Docket No. 151].  On November 30, 2022, the Court held a *Daubert* hearing.  [See Transcript of *Daubert* Hearing, Docket No. 190 ("Tr.").]  Thereafter, the Court received the parties' Post-*Daubert* Briefs.  [Docket Nos. 191 ("Pl.'s Post-*Daubert* Br."), 192 ("Def.'s Post-*Daubert* Br.").]  As these Motions are fully briefed, and live testimony having been taken, they are ripe for adjudication.  For the reasons stated on the record on November 30, 2022, and more specifically below, the Bak Motion will be **GRANTED**, and the Kytomaa Motion will be **DENIED**.

Furthermore, Defendant moves this Court to seal the Transcript of the *Daubert* Hearing and the post-*Daubert* briefs submitted by the parties.  [Docket Nos. 193, 194.] Defendant's second motion is opposed.  [Docket No. 195.]  For the reasons expressed below, the Court will **DENY** both motions.

## I.    FACTUAL BACKGROUND

In this putative class action, Plaintiff alleges that Defendant designed, manufactured, sold, and distributed over-the-range microwaves with stainless-steel handles that become excessively hot if a stovetop below is in operation (the "Microwaves," and the defective condition, the "Handle Defect"). [Am. Compl. ¶¶ 1, 2, Docket No. 26.] In particular, Plaintiff alleges that the Microwaves, which were specifically designed to be installed directly over a cooking surface, contain a handle that is constructed from "hollow tubes of razor thin stainless steel outer walls." [*Id.* ¶¶ 33, 35.] Each handle[1] "rapidly absorbs heat" when a cooktop is in operation below because each is hollow, constructed from stainless steel, and lacks insulation, which results in a handle temperature that exceeds 130˚F but can, "under the worst[-]case scenario," exceed 200˚F. [*Id.* ¶ 37.] Plaintiff asserts that this dynamic is contrary to a standard promulgated by the American Society of Testing Materials ("ASTM") known as ASTM Standard C1055-03,[2] which describes a spectrum of effects that can occur upon skin contact at a range of temperatures. [*Id.* ¶¶ 4, 40, 41, 42.] Essentially, ASTM C1055 advises that, "[i]f the surface temperature exceeds [158˚F] and the surface is metallic, it may present a hazard regardless of the contact duration." [*Id.* ¶ 43 (citing Ex. B, § 6.4.2).] Similarly, Underwriters Laboratories, Inc. ("UL") adopted

---

[1] Plaintiff refers to six stainless-steel handles corresponding to eleven different Microwave models. [Am. Compl. ¶¶ 35, 36.] The Court understands there to be no material differences between the handles nor the Microwaves.

[2] The standard is referred to as the "Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries." [Docket No. 26, Ex. B.]

a Standard for Safety for Microwave Cooking Appliances (which is known as, "UL 923") to be employed for testing purposes. [*Id.* ¶ 63.] UL 923 states that recorded temperatures of a metal handle or knob cannot exceed 131˚F. [*Id.*]

Between January 1, 2013 and July 10, 2018, Defendant allegedly distributed approximately 70,331 Microwaves to retailers in New Jersey. [*Id.* ¶ 19.] On May 16, 2015, Plaintiff purchased one of these Microwaves—specifically, a Frigidaire Gallery Over-the-Range Microwave. [*Id.* ¶¶ 12, 13, 46.] Plaintiff allegedly installed the Microwave over his cooking range, which contains gas burners, and after cooking on his stove one day, reached for the Microwave's handle and discovered that it was dangerously hot. [*Id.* ¶¶ 52, 53, 54, 55.] Knowing this condition or dynamic, Plaintiff alleges that he would not have purchased, or at least would have paid less for, his Microwave. [*Id.* ¶ 48.]

Plaintiff asserts that Defendant knew about the Handle Defect and distributed the Microwaves nevertheless. For instance, he alleges that one of Defendant's suppliers and manufacturers, which is no longer a party in this litigation, performed testing on the Microwave handles in 2010 and recorded temperatures that exceeded UL 923. [*Id.* ¶ 64.] Defendant apparently received notice of the problem from several other sources too. [*E.g.*, *id.* ¶¶ 65–66 (other litigation[3]), 67 (employees), 68 (consumers), & 71 (commercial builders).] Additionally, Plaintiff asserts that, with full knowledge of the Handle Defect, Defendant failed to rectify the issue (through

---

[3] See *Rice v. Electrolux Home Prods., Inc.*, No. 4:15-CV-00371 (M.D. Pa. filed Feb. 18, 2015).

repair or replacement of the handle) or warn consumers.  [*Id.* ¶¶ 9, 45.]

## II.    PROCEDURAL BACKGROUND

Plaintiff filed an initial complaint individually and on behalf of similarly situated persons in New Jersey Superior Court, Camden County, in May 2018. [Docket No. 1-1.]  Defendant removed this case to this Court on June 15, 2018. [Docket No. 1.]  On August 6, 2018, following a pre-motion letter filed by Defendant regarding its intention to file a motion to dismiss, Plaintiff filed the Amended Complaint.  [Docket No. 26.]  Defendant filed a motion to dismiss the Amended Complaint on August 31, 2018, [Docket No. 35], and Midea America Corp., formerly a defendant in this matter, filed a motion to dismiss as well, [Docket No. 47].  This Court issued an Opinion and Order denying the motions on April 29, 2019.  [Docket Nos. 67, 68.]  Defendant and Midea America Corp. sought reconsideration, [Docket Nos. 69, 70], which this Court denied as to Defendant but granted as to Midea America Corp., [Docket Nos. 90, 91].  Accordingly, Midea America Corp. was dismissed from this action on October 18, 2019.

Thus, in the Amended Complaint, Plaintiff asserts the following claims against Defendant: (1) breach of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2; (2) breach of the Magnuson-Moss Consumer Products Warranties Act, 15 U.S.C. § 2301; (3) breach of the Implied Warranty of Merchantability; and (4) unjust enrichment.

On March 27, 2020, Plaintiff filed a Motion to Certify this matter as a class action.  [Docket No. 105.]  Shortly thereafter, the parties filed several motions to preclude the testimony of each others' expert witnesses.  On November 20, 2020, the

Court set this matter for a virtual hearing to discuss Plaintiff's definition of the "Handle Defect," issues of predominance and commonality, and the availability of Drs. Bak and Kytomaa for a *Daubert* hearing. [Docket No. 173.] Pursuant to that Order, the Court administratively terminated Plaintiff's Motion to Certify [Docket No. 105] and all of the parties' *Daubert* motions [Docket Nos. 109, 111, 113, 115, 117, 136 & 138]. Following the virtual hearing (on December 3, 2020) and two settlement conferences (on January 6 and February 19, 2021), the Court administratively terminated this matter pending the parties' confirmation that their efforts to settle had been exhausted. [Docket No. 182.] Thereafter, the Court referred this matter to mediation. [Docket No. 184.] When Plaintiff advised the Court that mediation had proven unsuccessful and requested a conference, [Docket No. 187], the Court scheduled a *Daubert* hearing to focus on the testimony of Drs. Bak and Kytomaa in particular, [Docket No. 188].

## III.    LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony, permitting a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion, provided that:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Because Rule 702 "clearly contemplates some degree of regulation of the subjects and theories" to which an expert may testify, the Supreme Court has stated:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds" based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert*, 509 U.S. at 590; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144–45 (3d Cir. 2000). In practice, this requires the court to act as a "gatekeeper" to prevent expert testimony running afoul of Rule 702 from ever reaching the jury. *See Daubert*, 509 U.S. at 596–97. Thus, the court "must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The Third Circuit has described Rule 702 as embodying a "trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)). First, the witness must be qualified to testify as an expert, which requires "that the witness possess specialized expertise." *Id.* This requirement, however, has been interpreted liberally to encompass "a broad range of

knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (hereinafter, "*In re Paoli*").

Second, the testimony must be reliable, which demands that "the expert's opinion must be based upon the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" *Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742). In other words, the Court must ensure that the evidence adduced is scientifically valid. *Daubert*, 509 U.S. at 590. In determining the reliability of expert testimony, the Court is guided by the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742 n.8). However, the Court is not restricted to any "definitive checklist or test." *Daubert*, 509 U.S. at 593. This inquiry is "a flexible one" focusing "solely on the principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While reliability does not require "correctness," it does prohibit "too great a gap between the data and the [expert's] opinion proffered." *Oddi*, 234 F.3d at 146 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Id.* (quoting *Heller v. Shaw*

*Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).

Third, the expert's testimony must "fit" the case. *Daubert*, 509 U.S. at 592. Otherwise known as the "helpfulness" standard, this requires there to be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. The fit requirement "goes primarily to relevance." *Id.* "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404 (citations omitted). The party that proffers the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)).

## IV.    DISCUSSION

The Court first turns to the *Daubert* motions and then to the Motions to Seal.

### A.    The Bak Motion

Plaintiff proffers Dr. Bak as an "expert in engineering and the use of finite element analysis and modeling." [Tr. at 28–29.] He offers Dr. Bak's opinions to prove that a classwide defect—the Handle Defect—exists. Employing "available data" collected from Plaintiff's other experts, Dr. Bak conducted "finite element analysis"[4] with a "finite element model" ("FEM") to predict the temperature distribution of the Microwaves' handles when installed over an operating (gas) range. In other words,

---

[4] Dr. Bak explained that, "[f]inite element analysis is a method to model the physical world using computer simulation." [Tr. at 11.]

Dr. Bak was instructed to manipulate his FEM's parameters, using the available data, to identify "the dominant factors in heating of the handle." [Expert Report of Dr. Bak ¶¶ 8, 12, Docket No. 119-2 ("Bak Rpt."); Tr. at 73 ("Q. The main purpose of your computer simulations [was] to determine the dominant factors responsible for heating the microwave handles, right?" "A. Yes.").] He further explained that finite element analysis is a suitable technique for modeling "heat transfer through solids with known thermal boundary conditions, and between solids via radiation," in "parametric studies where input quantities can be changed and evaluated." [Bak Rpt. ¶ 9.] Ultimately, he formed the following five conclusions:

A.  Based on the simulations, the dominant heat source from the range to the microwave handle is due to radiation from the gas flame and metal grating below. The thermal analysis predicts that if no pot is present, the radiation from the front burner will cause the surface temperature of the handle to exceed 200˚F in under 4 minutes.

B.  The simulations show that the pot on the burner acts to block radiation, thereby reducing the transference of heat to the handle. Using common pot sizes, the handle surface temperature can exceed 165˚F.

C.  Previous analysis reveals that steam is not a significant source of heat transfer to the microwave handle. This behavior is confirmed by the speed in which the handle heats in testing. Instead, convection due to heated air and steam flowing over the handle acts to cool the handle heated by radiation.

D.  Key factors in how high the surface temperature of the handle will reach are the handle material, the wall thickness of the handle, the emissivity of the handle surface, and the orientation and magnitude of the heat source.

E.  Given stainless steel handle design, the handle wall thickness is a critical factor in how hot the handle reaches. Although the handles are manufactured as hollow, not solid, thicker walls would reduce the temperature in the handle by conducting the heat away through the handle material. The use of aluminum in place of

stainless steel, and/or increasing the material wall thickness, could potentially eliminate the surface temperature problem with the microwave handles altogether.

[Bak Rpt. ¶ 77.]

In the Bak Motion, Defendant submits three arguments challenging the foregoing conclusions and seeking to exclude Dr. Bak's proposed testimony. First, Defendant argues that Dr. Bak is not qualified to testify as an expert on heat transference because he is admittedly "not a combustion engineering expert" and his FEM is premised on the hypothetical fact that the "operating range" is gas-powered and produces a gas flame that transfers heat to the Microwave handles via combustion and primarily though radiation. [Docket No. 110, at 9–13 ("Def.'s Br.").] Second, Defendant argues that Dr. Bak's opinions should be excluded because they "do nothing to show that common issues regarding an alleged defect predominate over individual issues." [Id. at 14.] In other words, his opinions do not fit this case and would not help a jury determine a relevant issue because "he has no opinion on the existence of a common defect," "they do not relate to skin temperatures," they are "dependent on numerous variables" that differ among the homes in which the Microwaves are located, and they do not address electric or induction ranges, "which he did not model." [Id. at 14–29.] Third, Defendant challenges Dr. Bak's methodology and assumptions, asserting that they are not reliable because he incorrectly assumes that heat transfers predominantly through radiation, instead of convection; they are not the product of any real-world testing; and they incorrectly employ other assumptions. [Id. at 29–39.] Plaintiff opposes these arguments for the

11

reasons discussed below.  Each argument is discussed in turn.

### 1.    *Whether Dr. Bak is Qualified to Testify*

As explained above, the qualification requirement is interpreted "liberally," which permits a witness to possess "a broad range of knowledge, skills, and training" to qualify as an expert on a particular subject. *In re Paoli*, 35 F.3d at 741.  "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *In re Paoli*, 35 F.3d at 741).  In *Pineda*, the court "look[ed] beyond" the proposed expert's single statement that he did not offer himself as a "warnings expert" and found his formal qualifications "unassailable." *Id.* at 245.  The court also explained that the *Pineda* expert, an engineer, was substantively qualified to testify because of his expertise in the "stresses and other forces that might cause a material such as glass to fail" and because a proper warning—his proposed solution—was also a solution to an engineering problem. *Id.*  In other words, the proffered witness, through knowledge and available information, was capable of supporting the proposition that an explicit warning was necessary, even if he was not proposing "precise language" or "how it should appear in order to effectively convey its message." *Id.*  The court held that the proffered witness did not have to be the "best qualified" expert or have the "specialization" that the court deemed necessary. *Id.*  Perfect need not be the enemy of the Good.

Here, Dr. Bak is clearly qualified enough to testify as an expert witness in engineering and the use of finite element analysis and modeling.  First, he has suitable

educational and professional credentials.  Dr. Bak holds a B.S. in Civil Engineering from Lehigh University, an M.S. in Structural Engineering and Structural Mechanics from the University of California at Berkeley, and a Ph.D. in Applied Mechanics from the University of Connecticut.  [Bak Rpt., App'x B, at 48.]  An engineer by training, Dr. Bak has worked in private practice at a major research firm focusing on structural analysis, heat transfer analysis, composite life prediction, fracture mechanics, computer programming, and applied mathematics.  [*Id.* at 47.]  Dr. Bak served on a committee that helped redesign the solid rocket boosters that failed during the Space Shuttle Challenger disaster.  [Tr. at 12, 16–18.]  Additionally, on a subcontract while at another research firm, Dr. Bak was involved in analyzing how the World Trade Center towers failed during the attacks of September 11, 2001.  [Tr. at 18–19.] Through finite element analysis, Dr. Bak was able to model beam failure at high thermal loads.  [Tr. at 19–26.]  The Court finds that Dr. Bak's formal qualifications are "unassailable." *Pineda*, 520 F.3d at 244.

Second, Dr. Bak's substantive qualifications are sufficient to serve as an expert as Plaintiff proposes.  In other words, he has the knowledge and information necessary to render his opinions, even though his core competency is not combustion.  In its moving papers, Defendant objected to Dr. Bak's qualifications, arguing that he should be excluded because he lacks expertise in the field of combustion, as he allegedly admitted.  [Def.'s Br. 10–11 (citing Bak Dep. at 148:12–14).]  In support, Defendant claims that Dr. Bak incorrectly assumed in the FEM that radiation from the gas flame of an operating stovetop is the dominant source of heat transfer to Microwave handles.

[*Id.* at 12 (citing Bak Rpt. ¶ 13 (A)).]  Defendant continues: "Because a gas range generates heat through combustion and transfers heat to objects above primarily through convection, expertise in combustion should be a predicate to testimony in this case as it relates to the alleged 'Handle Defect.'"  [*Id.*]  However, during the *Daubert* hearing, Defendant seemed to concede that Dr. Bak is qualified to serve as an expert as Plaintiff proposes.  [Tr. at 29 ("[Defendant has] no objection to what [it] would consider [to be] limited expertise for purposes of this case"); *id.* ("no objection to Dr. Bak as an expert with respect to finite element analysis or finite element modeling").]  In its post-*Daubert* briefing, Defendant appears to reframe its objection to Dr. Bak's qualifications as simply a challenge to the reliability and relevance of his FEM, not his expertise.  [*See generally* Def.'s Post-*Daubert* Br.]

Defendant's position was wise.  The Court finds that nothing about Dr. Bak's knowledge, skill, training, or experience prevents him from rendering the opinions he set forth in his report and during the *Daubert* hearing of November 30, 2022.  Although admittedly not a "combustion engineering expert," Dr. Bak, through knowledge and available information, is competent to testify.  *See Pineda*, 520 F.3d at 245.  Of course, this conclusion does not necessarily imply that his opinions "fit" this case or are the product of a reliable methodology, as discussed herein.  But the Court will not exclude Dr. Bak based on Defendant's earlier view that combustion expertise is a prerequisite here.

## 2.    *Whether Dr. Bak's Opinions are Relevant to the Issues in this Case*

Next, the Court turns to Dr. Bak's proposed opinions.  To determine whether a

proffered expert's opinions are relevant and "fit" the case, a court must ask whether they will "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a); *Karlo v. Pittsburg Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017). This condition goes primarily to relevance. *Daubert*, 509 U.S. at 591. "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case.*" *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020) (quoting *In re Paoli*, 35 F.3d at 743) (emphasis in original).

Here, the central purpose of Dr. Bak's testimony—for Plaintiff's case—is to prove the existence of a common or classwide defect, i.e., the Handle Defect. [Docket No. 133, at 1 ("Pl.'s Opp.") ("Dr. Bak applied his vast expertise and experience to explain the how and why of the Handle Defect in the Microwaves. Simply put, the root cause of the Handle Defect is the use of stainless steel to fashion a curved, hollow handle consisting of thin walls, which is the same for all of the Microwaves' handles."); *id.* at 28 ("Dr. Bak's analysis explains the Handle Defect for the Court and jury, establishes its root cause, and offers a clear remedy."); Tr. at 36 ("Q. So what did they ask you to do in this case?" "A. I was asked to determine why the handles get hot.").] If the Microwaves' handles are defective in the aggregate because they all reach excessive and dangerous temperatures, Plaintiff believes that he can achieve class certification and demonstrate that Microwave purchasers all suffered the "claimed benefit of the bargain damages." [*See* Pl.'s Post-*Daubert* Br. 5 (articulating theory).] Thus, Dr. Bak's testimony is critical for Plaintiff to establish that the Handle Defect

15

exists in all Microwaves and to meet the requirement that common issues predominate over individual ones in this litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 350 (2011) (applying Fed. R. Civ. P. 23 to require that proposed class suffer the same injury) ("That common contention . . . must be of such a nature that it is capable of classwide resolution . . . in one stroke.").

It is at this juncture that Dr. Bak's testimony proves fatal to Plaintiff's case. Plaintiff claims that "Dr. Bak's conclusions apply equally to each Microwave in the Class, and the undisclosed, latent Handle Defect existed in each Microwave handle at the time of sale." [Pl.'s Opp. 29.] Yet Dr. Bak did ***not*** identify the existence of a common defect or "root cause" that can be demonstrated through his FEM. [Tr. at 74–75 ("Q. [Y]ou determined that there were multiple factors and variables affecting how hot the surface of a microwave handle might get, right?" "A. Yes."); Tr. at 90 ("[Y]ou did not isolate any one of the[] five factors [you identified] as the most important or the root cause reason for an increase in the surface temperature of the microwave handles, correct?" "A. Yeah.  I didn't rate the importance. . . . I wasn't tasked to necessarily pick one thing."); Tr. at 91–92 ("Q. Your computer simulations were not intended to prove that every microwave handle at issue in this case will heat to some excessive or hot temperature that would prevent a consumer from using the microwave, correct?" "A. Correct.").]

Instead, Dr. Bak conducted a finite element analysis that was based on supplied data from Plaintiff's Microwave, [Tr. at 35–36, 102 ("Mr. Farnan's testing in the Gorczynski home")], to demonstrate why "these handles get hot and other ones

don't," [Tr. at 61]. He identified five factors that affect the Microwaves' handle temperature and *can* cause, *under certain circumstances*, the handles to become excessively hot, [Bak Rpt. ¶ 77(D); Tr. at 59–60 (describing the key factors to be the handle material, the handle's wall thickness, the emissivity of the handle surface, the orientation of the heat source, and the magnitude or thermal load of the heat source)]. But Dr. Bak also conceded that *other variables* could affect handle temperature, such as the conductivity between the Microwave handle and the body of the Microwave, [Tr. at 94–96], the orientation of the burners on a gas range, [Tr. at 126–27], distance of the gas range from the wall, [Tr. at 127–29], whether a Microwave's vent fan was "on" or "off," [Tr. at 129], the manner in which a homeowner uses the range to cook, [Tr. at 130], and whether the range was gas, electric, or induction, [Tr. 148–49.] *His FEM did not simulate, or account for, any of these variables.*

This is the death knell for Plaintiff: because these variables represent material differences between consumers in his proposed class, Dr. Bak's opinions are only relevant to demonstrate that *Plaintiff's* Microwave is defective and other Microwaves *could be defective*, *depending on the circumstances*. [Tr. at 134–35 ("[Dr. Bak:] Well, I think what I showed is that under certain conditions, these handles can get hot." "The Court: Can . . . But you can't say whether they do or don't." "[Dr. Bak:] Right."] So, for Dr. Bak's opinions to "fit" this case, he would have had to model all of the foregoing variables or conduct real world tests of other consumers' Microwaves to show that the proposed class actually suffered a common defect. Dr. Bak was not

17

given this instruction however, and without such analysis, Dr. Bak's opinions cannot establish, on their own, that all Microwave consumers were injured by the alleged Handle Defect. His opinions are, simply, irrelevant to the proposition for which they are proffered and, as a result, could mislead a jury as to the issues in this case. *See Gonzalez v. Corning*, 885 F.3d 186, 198–99 (3d Cir. 2018) (explaining that plaintiffs in "benefit of the bargain" case were required to prove that all members of putative class actually experienced common defect, not "mere possibility that one might exist"); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 456 (D.N.J. 1998) (finding that common issues did not predominate because plaintiff did not establish that majority of proposed class members had experienced common defect); *see also Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 986 (9th Cir. 2020) ("identification of general 'potential problems' in the absence of the identification of a specific defect present in all the regulators did not constitute 'an opinion that fits [p]laintiffs' class-certification argument" (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

Accordingly, Plaintiff's post-*Daubert* gloss fails. He suggests that Defendant's focus on the above "post-sale circumstances in consumers' homes" reflects a mischaracterization of Plaintiff's claims. [Pl.'s Post-*Daubert* Br. 4–5.] Because his central claim focuses on economic, rather than personal, injury, Plaintiff need only prove that a defect in common exists, not that the defect causes some additional injury. [*Id.* at 3.] Plaintiff's creative distinction misperceives the problem. Plaintiff has not demonstrated that a common defect exists. As explained above, all 70,331 Microwave handles at issue in this litigation are not necessarily defective because the purported

injury depends on numerous other variables that Dr. Bak's FEM does not address. Dr. Bak's "clearly identified multiple flaws"—use of stainless steel (rather than aluminum) and the thinness of the metal handles, among others—are only defective for other consumers insofar as several unaddressed circumstances obtain. But Dr. Bak's simulation focuses on Plaintiff's Microwave alone. Thus, Dr. Bak's proposed testimony does not "fit" this action and must be excluded at least for this reason alone.[5]

### 3.    *Whether Dr. Bak's Methodology and Assumptions are Reliable*

Next, the Court addresses the reliability of Dr. Bak's proposed testimony. To determine whether an expert's opinion is based on the "methods and procedure of science" instead of "subjective belief or unsupported speculation," the Court is guided by the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

---

[5] As previewed above, *supra* Section IV, page 11, Defendant presents other arguments in its moving papers explaining why Dr. Bak's opinions do not "fit" this case. For instance, Defendant claims that, for Dr. Bak's opinions to be relevant, Plaintiff must "establish some connection between the surface temperature of a microwave handle and the temperature of human skin in contact with such a handle." [Def.'s Br. 17.] This conclusion is a central observation articulated in Dr. Kytomaa's proposed testimony. See *infra* Section IV.B. But based on the foregoing analysis, the Court does not need to reach this argument. While the Court agrees that an expert's opinions "do not need to be relevant to every single issue raised," *Tomeo v. CitiGroup, Inc.*, 2018 WL 4627386, at *6 (N.D. Ill. Sept. 27, 2018) ("such a holding would be untenable"), Dr. Bak's opinions must be excluded because he omits other variables from his analysis, which could confuse even the most diligent jury.

*Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742 n.8). While the foregoing factors are not a "definitive checklist or test," *Daubert*, 509 U.S. at 593, the Court employs a "flexible" inquiry that focuses "solely on the principles and methodology, not on the conclusions that they generate," *id.* at 595. *See also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (stating that courts must scrutinize the expert's "methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion").

Reliability does not mean that a particular opinion has "the best foundation" or that it is supported by the "best methodology or unassailable research." *Karlo*, 849 F.3d at 81. Rather, the reliability requirement prevents "too great a gap between the data and the [expert's] opinion proffered." *Oddi*, 234 F.3d at 146 (quoting *Joiner*, 522 U.S. at 146). Accordingly, opinions that are based on unsupported assumptions will be excluded given their "speculative character." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999).

Here, Defendant first argues that Dr. Bak wrongly assumed that heat from a gas burner transfers to a Microwave handle principally through the process of radiation, rather than convection or conduction (the other modes of heat transfer). [Def.'s Br. 31.] Defendant contends this assumption is contrary to science and unsupported by a single peer-reviewed article. [*Id.*] In contrast, Plaintiff suggests that Dr. Bak considered all three modes of heat transfer, even though he only modeled radiation, and Plaintiff attempts to distinguish *Rutigliano v. Valley Business Forms*, 929 F. Supp.

20

779 (D.N.J. 1996), which Defendant cites for the proposition that Dr. Bak's testimony should be excluded as not generally accepted by the scientific community because he failed to cite literature supporting his radiation assumption.  [Pl.'s Opp. 20.]

As detailed above, on November 30, 2022, Dr. Bak testified that to determine why the Microwaves' handles "get hot," he created an FEM based on data collected by Mr. Farnan at Plaintiff's home.  [Tr. at 58; Bak Rpt. ¶ 11.]  After inputting Mr. Farnan's temperature data into his FEM, he manipulated analysis parameters and concluded that "the dominant heat source from the range to the microwave handle is due to radiation from the gas flame and metal grating below."  [Bak Rpt. ¶ 13(A).]  As Dr. Bak confirmed, radiation "is when heat energy moves between two surfaces that have a direct line of sight between them."  [Tr. at 69–70.]  This "makes sense," he testified, because "a bigger pot blocks more of the heat from getting up to the handle, and we showed that, and it was measured that[,] if you take the pot away, the handle can get over 200 degrees."  [Tr. at 58–59.]  Convection "occurs when heat energy moves between a gas and a solid," where "hot gases from the burner and the flame [] rise up and around the handle."  [Tr. at 69.]  Convection is "not a significant source of heat transfer" and "may act to cool the handle heated by radiation," he believes, because a "previously performed computational fluid dynamics simulation" confirmed as much.  [Bak Rpt. ¶ 13(C) n.2 (citing Dr. Bak's expert report in the *Rice* matter).]  The effect of conduction—"when heat energy moves within a solid"—is minimal, he believes, because steel has a "very low diffusivity, so it stores heat much more than it conducts heat."  [Tr. at 68, 95.]

The trouble for Dr. Bak's theory in the instant case, however, is that he failed to model heat transfer due to radiation *and* convection *and* conduction, which all indisputably affect the temperature of a Microwave handle given a gas-powered range operating below.  Dismissing the significance of convection and conduction, Dr. Bak largely assumed that heat transferred to Plaintiff's Microwave handle primarily through the process of radiation alone, and he built his FEM on this assumption.  [Tr. at 92–93.]  This presents an incomplete, if not false, picture of the thermal dynamics. For instance, Dr. Bak acknowledged on cross-examination that conduction would *lower* the surface temperature of the bottom of the Microwave handle because the Microwave body, through the connection point with the handle, draws heat inward. [Tr. at 94.]  Because he assumed that radiation is the dominant process, the FEM results predict "the hottest temperature on the handle was at the lowest point *based on the assumptions in the analysis*." [Tr. at 93.]  In other words, his model does not simulate the amount of heat transferred through conduction because he specifically omitted this process, even though "[i]t makes some difference," he stated.  [Tr. at 95.]

Similarly, as Defendant explains, Dr. Bak dismissed the process of convection based on modeling that another expert performed in the *Rice* matter, which analyzed heat transfer due to steam rising from a boiling pot of water, not due to a gas flame alone.  [Docket No. 144, at 10 (Def.'s Reply Br.).]  This, too, was questionable because convection is at least a significant mode of heat transfer, if not the dominant mode—

the *opposite* of what Dr. Bak assumed. [See Tr. at 185–88.[6]] Indeed, Dr. Bak's simulation ignored the transfer of heat via convection, and he even acknowledged, on cross examination, that Mr. Farnan's test results—which showed the handle becoming *cooler* towards the bottom, not *hotter* as Dr. Bak modeled—are actually "more consistent with heat transfer through convection than radiation." [Tr. at 143.]

The Court would exercise greater hesitation, and more deference to Dr. Bak's considered judgment, if Plaintiff could point to generally accepted scientific evidence to support Dr. Bak's assumption that radiation is the dominant mode of heat transfer in Plaintiff's circumstances. But he cannot, and Dr. Bak does not dispute this. [Tr. at 93 ("Q. You cannot identify any generally accepted publications, standard, or guideline that states that a gas range transfers heat primarily through radiation as opposed to convection, correct?" "A. I did not find any publications on that.").] Moreover, Plaintiff's argument that *Rutigliano* is unpersuasive and factually distinguishable misses the point. Dr. Bak's assumption is unsupported; speculation is not consistent with the requirement that an expert's opinions must be based on a reliable methodology. *See In re TMI Litig.*, 193 F.3d at 670. Accordingly, Dr. Bak will be excluded from testifying for this reason as well.

Furthermore, Defendant argues that Dr. Bak employed a series of additional unsupported assumptions that undermine the reliability of his testimony—

---

[6] The Court bases this conclusion on Dr. Bak's expert report and testimony as well as Dr. Kytomaa's expert report, not Dr. Kytomaa's testimony regarding relative percentages of heat transfer, as such testimony was not a part of his report.

assumptions that all flow from his conclusion that the dominant mode of heat transfer is radiation. [Def.'s Br. 32–37.]    Based on the foregoing and the record evidence, the Court concludes that it does not need to determine whether it was unreliable for Dr. Bak to (a) represent the thermal load of the gas burner as a "solid, circular ring" of various arbitrary sizes or (b) intuit, based on an application of the Stefan-Boltzmann law, that such ring's temperature is 1,922°F.    These assumptions may have been independently unreliable, but the Court need not decide at this juncture because it can conclude, without hesitation, that they are dependently unreliable. *Cf. In re TMI Litig.*, 193 F.3d at 670.

Finally, Defendant argues that Dr. Bak's opinions are unreliable because they do not align with Mr. Farnan's test results, and Defendant implies that Dr. Bak should have validated the FEM with his own testing. [Def.'s Post-*Daubert* Br. 6–7.]    In contrast, Plaintiff argues that no such requirement exists, and that, in any case, Dr. Bak validated all physical dimensions and conditions used in his FEM. [Pl.'s Post-*Daubert* Br. 6.]    Defendant's challenge is a subject for cross-examination, Plaintiff asserts. [*Id.* at 7.]    The Court agrees with Defendant.    While Dr. Bak is "not an experimentalist" and does not "do testing," [Tr. at 72], the Court cannot find his FEM to be reliable when it is inconsistent with the very test results purportedly providing the model's foundation.    Mr. Farnan's data is more consistent with a theory of heat transfer predominantly through convection, not radiation.    [Tr. at 143.]    Therefore, because Dr. Bak bases his computations on a flawed assumption that is inconsistent

24

with the expert on whom he built his model, his opinions will be excluded as unreliable as well. *See Heller*, 167 F.3d at 153.

**B.    The Kytomaa Motion**

Next, the Court turns to Dr. Kytomaa's opinions.  Defendant offers Dr. Kytomaa's testimony in order to challenge the existence of the Handle Defect, and the Court qualified Dr. Kytomaa as an expert in "thermal dynamics and heat transfer through the processes of conduction, convection, and radiation, as well as an expert with respect to UL standards and ASTM standard C1055." [Tr. at 178–79.]  He formed the following thirteen opinions in this case:

1.    The [P]laintiff's experts have not established that there is a handle defect that introduces a "substantial risk of permanent and/or serious injury" when the Gorczynski microwave handle is used while the cooking surface is operating below the microwave.

2.    The [P]laintiff's experts have not established that the Electrolux microwave handles at issue will reach surface temperatures in each potential class member's home that create a "substantial risk of permanent and/or serious injury" uniformly across the class when their microwave handles are used while cooking surfaces operate below the microwaves.

3.    When tested in accordance with Condition B of Section 42.4.5.3 of UL 923 Standard for Microwave Cooking Appliances, the handle of the Frigidaire Gallery Over-The-Range Microwave Oven (Model No. FGMV154CLFA) passes the requirements set forth in UL 923 for that test. Five other Electrolux over-the-range microwaves were subjected to this same testing, and all five of those models also met the requirements set forth in UL 923.

4.    During the above-mentioned testing, the temperatures measured on the surface of the microwave handle presented no danger for contact burn injuries.

5.    The surface temperature limits outlined in UL 923 for the tests specified in Section 42.4.5.3 are applicable to that test only and are not applicable to other test scenarios. If a microwave's measured

surface temperatures during that test remain below the specified temperature limits, that microwave will have met the UL 923 standard for that test.

6.      The potential for incurring a contact burn injury is chiefly a function of the amount of heat energy that flows into a person's skin and time duration of this energy flow. Skin temperature over time may be used as a means for assessing the energy flow into a person's skin over time and the resulting potential for incurring a contact burn injury (as outlined in ASTM C1055).

7.      When human skin comes into contact with the surface of an appliance that is at an elevated temperature, the skin temperature will begin to rise, but the skin temperature will be lower than the original elevated temperature of the surface. Thus, skin temperatures and surface temperatures are not equivalent and cannot be referred to interchangeably.

8.      The potential for incurring a burn injury from contact with an over-the-range microwave handle depends on many physical variables including the material composition of the handle, the geometry of the handle, the position of the microwave, the position and geometry of the range, the power of the burners underneath the microwave handle, the type of range (e.g., gas, electric, induction) beneath the microwave, the operation of the microwave vent fan, and the air flow in the area of the microwave.

9.      The potential for incurring a burn injury from contact with an over-the-range microwave handle also depends on many physiological variables including the size of the person and his or her hand, composition of the skin, the rate of blood flow through the skin layers, the thickness of the different skin layers, the age and physical condition of the person, and the reaction time of the person.

10.     The potential for incurring a burn injury from contact with an over-the-range microwave handle also depends on many use-pattern variables including the degree to which the range and microwave are used simultaneously, the length of time a burner is typically used before the microwave handle may be grasped, the type of pots and pans used on the range, the geometry of the pots and pans used on the range, and the burner settings for typical range use.

11.     In order to properly assess the potential for a burn injury risk via the handle from an over-the-range microwave, the above-mentioned variables need to be documented via site inspections,

testing, and/or interviews with end users.

12.   The effects of the above-mentioned variables on the potential for a burn injury risk cannot be assessed via the simulations conducted by Dr. Bak because his model is not reliable and is based on a methodology that is not generally accepted in the discipline of heat transfer. More specifically, it is not properly validated and does not model the correct heat transfer mechanisms for a range operating below an over-the-range microwave. In addition, his model is limited to a single installation and does not attempt to represent the asserted class.

13.   Plaintiff's experts limited their testing and simulations to gas ranges. They offered no opinions and have no data concerning the surface temperature of microwave handles above electric or induction ranges. The surface temperatures of microwave handles above electric or induction ranges will be less than the temperature of microwave handles above gas ranges.

[Expert Report of Dr. Harri Kytomaa, Docket No. 119-3, Ex. C, at 12–13 ("Kytomaa Rpt.").]

In the Kytomaa Motion, Plaintiff advances two main arguments.  First, Plaintiff claims that Dr. Kytomaa's opinions do not fit the issues of this action because (a) they rely on UL 923 (an allegedly inapplicable testing standard), (b) they address an irrelevant issue—"a substantial risk of permanent and/or serious injury"—which Plaintiff asserts is not an element of his causes of action, and (c) they are based on site inspections of consumers' homes who are outside of Plaintiff's proposed class. [Docket No. 139, at 17–26 ("Pl.'s Br.").]  Second, Plaintiff argues that Dr. Kytomaa employs a faulty and unreliable methodology by conducting UL 923 testing.  [*Id.* at 26–28.]  Finally, "[t]o the extent any of [Dr.] Kytomaa's remaining opinion[s] have any basis outside of [his] UL 923 testing, they are 'net opinions.' "  [*Id.* at 28.]

In response, Defendant argues that Dr. Kytomaa's opinions are relevant

because Plaintiff must establish the existence of the Handle Defect on a classwide basis to prevail, and he cannot do so.  [Docket No. 141, at 3–7 ("Def.'s Opp.").]  Plaintiff cannot establish a classwide defect because (a) he inappropriately relies on ASTM C1055 to prove that the handles reach an excessive temperature, and (b) there are numerous variations within Plaintiff's proposed class demonstrating that the Handle Defect does not exist in every Microwave.  [*Id.* at 10–14.]  Defendant also asks the Court to disregard Plaintiff's challenges to Dr. Kytomaa's opinions because ten out of Dr. Kytomaa's thirteen opinions are not based on UL 923 and Plaintiff's objections concerning Dr. Kytomaa's site inspections have no merit.  [*Id.* at 7–10, 14–20.]  Finally, Defendant argues that Dr. Kytomaa's UL 923 testing reliably demonstrates that Plaintiff cannot prove a classwide defect because UL 923 is designed to measure heat transfer under certain circumstances and in accordance with specific protocols. [*Id.* at 20–34.]

At bottom, Plaintiff's challenge rests almost entirely on Dr. Kytomaa's use of UL 923 to establish why a classwide defect does not exist.  Accordingly, the Court focuses its analysis predominately on whether his use of UL 923 testing is relevant to this case and whether his methodology is reliable.

As the Court articulated above, to determine whether a proffered expert's opinions are relevant and "fit" the case, a court must ask whether they will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a); *Karlo*, 849 F.3d at 81.  This condition goes primarily to relevance.  *Daubert*, 509 U.S. at 591.  Additionally, to determine if an expert's testimony is reliable, the Court

must conclude that his opinion is "based upon the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.' " *Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742). Essentially, the reliability inquiry addresses whether "the expert's testimony is supported by 'good grounds.'" *Karlo*, 849 F.3d at 81 (quoting *In re Paoli*, 35 F.3d at 745).

Here, Plaintiff's challenges to Dr. Kytomaa's opinions are not persuasive. First, as a threshold matter, Plaintiff seeks to persuade this Court that "a substantial risk of permanent and/or serious injury" is not an element of any of his causes of action. Accordingly, he argues, Dr. Kytomaa's first two opinions (1 and 2) are irrelevant to this case because they are based on the mistaken view that Plaintiff must prove that the putative class experienced personal injury. [Pl.'s Br. 24–25; *see also* Pl.'s Post-*Daubert* Br. 3–5.] Not so. As the Court discussed above, Plaintiff's distinction misses the point. See *supra* Section IV.A.2, pages 18–19. Plaintiff's claims are all premised on the existence of a common defect, which he defines as follows:

> The Microwaves are designed for installation on a vertical wall directly above the cooking surface of the range, but when the cooking surface below is in operation the Microwave's stainless steel handle heats to excessive temperatures, as objectively defined in New Jersey and the United States, rendering the handle unfit for use with a bare hand and exposing anyone who touches it to a substantial risk of permanent and/or serious injury ("Handle Defect").

[Am. Compl. ¶ 2.] The Handle Defect allegedly exists in all Microwaves. [*Id.* ¶ 92.] To prevail, then, Plaintiff must establish that his alleged defect—the Handle Defect— actually exists in all Microwaves in his proposed class, not simply that Plaintiff's defective Microwave *suggests* that other consumers' Microwaves are also defective.

29

Class actions do not work that way. *See Gonzalez*, 885 F.3d at 198 ("Rule 23 requires, if nothing else, that a putative class must describe the product's defect on a classwide basis."); *id.* at 202 (explaining that, because liability for defective design and misrepresentation claims were not susceptible to classwide evidence, plaintiffs failed to meet Rule 23(b)(3) requirements).[7]   Therefore, Dr. Kytomaa's opinion—that Plaintiff's experts have not established that Defendant's Microwave handles introduce "a substantial risk of permanent and/or serious injury"—plainly "fit" this case. *See Karlo*, 849 F.3d at 81.

Second, Plaintiff incorrectly asserts that UL 923 has no application to Plaintiff's Microwave and, thus, no relevance to this case. [Pl.'s Br. 18–19.]  A brief review of Dr. Kytomaa's use of UL 923 testing is in order.  Generally, Dr. Kytomma testified that UL 923 is a "consensus standard developed by UL that has a committee that works on its consensus standard for [] safety in a variety of categories associated with microwave ovens." [Tr. at 227.]  The standard states that a microwave's metallic handle, knob, grip, or the like cannot exceed 131°F when testing is performed in accordance with UL 923's specific protocols. [UL 923 § 42.3.1, Tbl. 42.2, Docket No. 106-16.]  In accordance with these protocols, Dr. Kytomaa conducted UL 923 testing

---

[7] The Court is mindful that it is not deciding a pending motion for class certification at this stage, and it is not engaging in a "free-ranging merits inquir[y]" to determine whether a putative class satisfies the requirements of Rule 23. *Amgen v. Connecticut Ret. Plans & Trust Funds*, 568 U.S 455, 466 (2013).  Rather, in the context of evaluating the parties' *Daubert* challenges to their respective key experts, the Court is cognizant of how Plaintiff's claims would be tried if this action were certified. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

on the same model as Plaintiff's Microwave[8] and five other Microwave models and concluded that none of the handles exceeded 131°F. [Kytomaa Rpt. 30, 33–39.] He thus opined that "[d]uring the above-mentioned testing, the temperatures measured on the surface of the microwave handle presented no danger for contact burn injuries." [*Id.* at 12 (Op. 4).]

Plaintiff argues that Dr. Kytomaa's opinions are irrelevant because the scope of UL 923 § 42 is limited to microwaves with a thermal element. [Pl.'s Br. 19–20.] As Dr. Kytomaa performed UL 923 testing on Microwaves without a thermal element, his conclusions have no bearing on whether the Handle Defect exists (or, indeed, does not). [*Id.*] But Plaintiff acknowledges that his Microwave *contains a thermal element*. [Pl. Reply Br. 3.] This is the very reason Dr. Kytomaa employed UL 923 testing in the first place. [Tr. at 227 ("Q. [I]s UL standard 923 applicable to this case?" "A. Yes . . . the Gorczynski microwave is listed under UL 923 . . . And I understand that the Gorczynski microwave oven was subjected to the UL 923 surface temperature tests").] So Plaintiff's argument sweeps too broadly. Additionally, Dr. Kytomaa testified that he employed UL 923 testing for Microwaves without thermal elements because, in his opinion, nothing in the standard specifically *prohibits* its application to such Microwaves. [*E.g.*, Tr. at 249 ("UL 923 is applicable to all microwave ovens."); *see*

---

[8] Plaintiff points out that Dr. Kytomaa never performed UL 923 testing on Plaintiff's Microwave specifically. [Pl.'s Br. 14–15.] This appears to be for good reason. UL 923's testing protocols require an environment suitable for testing (*e.g.*, a laboratory) and are not easily performed within a consumer's home. [Tr. at 241–242, 271–272; Def.'s Opp. 31 n. 8.] To the extent Plaintiff is suggesting that Dr. Kytomaa's choice undermines the reliability of his conclusions, the Court is unpersuaded.

*also* Tr. at 247–54.]  In other words, the fact that UL 923 compliance testing is required for Microwaves *with* thermal elements does not mean, necessarily, that Microwaves *without* thermal elements cannot be evaluated under the same standard.  Plaintiff's challenge is an appropriate subject for cross-examination but not a basis to exclude Dr. Kytomaa's testimony.

Next, Plaintiff claims that UL itself contradicts Dr. Kytomaa's view that UL 923 § 42 is a useful test to measure the transfer of heat from an operating cooktop to a Microwave handle.  [Pl.'s Br. 20.]  According to Plaintiff, this demonstrates that Dr. Kytomaa's UL 923 testing does not fit this case or generate a reliable conclusion.  [*Id.*; *see also* Pl.'s Reply Br. 3–5.]  The Court rejects Plaintiff's argument.  Defendant's reproduction of the relevant deposition testimony—instead of Plaintiff's self-serving truncation—is instructive.  UL's representative explains that UL 923 testing involves the measurement of the surface temperature of a microwave handle due to the transference of heat from an operating cooktop below.  [Def.'s Opp. 28–29 (citing DelleVelle Dep. at 134:13–151:3, Docket No. 106-17.]  The confusion in the record appears to rest with Plaintiff's attempt to elicit testimony from UL that the *sole* intent of UL 923 is to measure heat transference from the Microwave's internal thermal element, not an operating cooktop below.  That interpretation is not supported by UL's representative, nor does it appear to be the most natural reading of UL 923.[9]

---

[9] Plaintiff also claims that Dr. Kytomaa's opinions do not "fit" this case because he inaccurately contends that Plaintiff's experts rely on UL 923.  [Pl.'s Br. 21–22.] Defendant disagrees, insisting that Plaintiff's experts, in fact, "relied on UL 923 as an applicable standard."  [Def.'s Opp. 32.]  The Court notes a disagreement between the

Third, Plaintiff's objection to Dr. Kytomaa's site inspections in connection with the *Rice* action is meritless.  As part of his analysis, Dr. Kytomaa visited the homes of consumers who purchased the same microwaves as those at issue in this litigation and whose microwaves all allegedly suffer the Handle Defect.  [Kytomaa Rpt. 47–65.]  Dr. Kytomaa and his team conducted measurements of these microwaves, which informed his opinion that numerous variables and variations within Microwave consumers' homes affect whether any Microwave handle in particular will reach an excessive and dangerous temperature.  [*Id.* at 12–13, 47–65; Tr. at 219–20.]  Plaintiff cannot successfully argue that his opinions are irrelevant simply because such consumers are outside of his proposed class.  After all, Plaintiff admits that such microwaves are allegedly defective for the same reasons as the Microwaves are.  [Pl.'s Br. 25.]  Additionally, Plaintiff lacks support for the proposition that Dr. Kytomaa's opinions should be discredited as irrelevant; his reliance on *Mendez v. Avis Budget Grp., Inc.*, 2019 WL 1487258 (D.N.J. Apr. 3, 2019) is misplaced, as *Mendez* stands for the proposition that a party cannot serve discovery on absent class members where, *inter alia*, the information sought is of questionable relevance. 2019 WL 1487258, at *3. The proposition has no bearing on whether Dr. Kytomaa's measurement of microwaves at non-class members' homes is relevant here, as no party is seeking

---

parties' experts on the applicability—or, perhaps more precisely stated, the utility—of UL 923 testing.  But the Court fails to see why such disagreement is a basis to exclude Dr. Kytomaa, especially where Dr. Bak indeed cited UL 923 as an applicable testing standard in the background section of his report.  [Bak Rpt. ¶¶ 24, 25.]  Plaintiff has not set forth a convincing basis for this Court to find that Dr. Kytomaa's use of UL 923 testing is unreliable.

discovery at such homes.

Furthermore, Plaintiff's challenge is once again premised on his mistaken theory that the Microwaves are defective at the point of sale, whether or not the Microwave handles in fact reach an excessive temperature. [Pl.'s Br. 26.] Not so. As this Court has already explained, Plaintiff must establish the alleged defect on a classwide basis. See *supra* Section IV.A.2, pages 18–19.

Finally, under the guise of challenging the reliability of Dr. Kytomaa's testimony, Plaintiff asserts that Dr. Kytomaa's conclusions are "net opinions" or "pure *ipse dixit*" because they are not supported by analysis or testing (other than UL 923). [Pl.'s Br. 28; *see also* Pl.'s Reply Br. 11–15.] Plaintiff argues that Dr. Kytomaa "applied his experience to no data set or facts to form his opinions relating to ASTM C1055 or 'burn injury risk.'" [Pl.'s Br. 28.] Under New Jersey law, a "net opinion" is an expert's "bare conclusions, unsupported by factual evidence." *Buckelew v. Grossbard*, 87 N.J. 512, 435 A.2d 1150, 1156 (1981). But the rule prohibiting net opinions is "merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under the fit requirement of Rule 702 of the Federal Rules of Evidence." *Holman Enter. v. Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 n.12 (D.N.J. 2008) (cleaned up) (citation omitted). The Court construes Plaintiff's challenge accordingly.

The Court finds that Dr. Kytomaa's testimony does not constitute a net opinion, nor is it supported by mere *ipse dixit*. First, Dr. Kytomaa's use of UL 923 testing is relevant and reliable, as the Court explained above, so his opinions are adequately supported. Second, in any case, Dr. Kytomaa is serving as Defendant's rebuttal

expert, and his opinions are based on his knowledge and experience and his review of Plaintiff's experts' opinions. "[B]asing an expert opinion on another expert's opinion reflects sound judgment. Indeed, a benchmark of any sound analysis is citing or critiquing the opinions of other expert opinions." *Counts v. Gen. Motors, LLC*, ---F. Supp. 3d. ---, 2022 WL 2078023, at \*26 (N.D. Mich. June 9, 2022) (citing *In re Melton*, 597 A.2d 892, 901 (D.C. 1991) (en banc)). Therefore, the Court dismisses Plaintiff's argument and finds that Dr. Kytomaa's opinions "fit" this action and are the product of reliable methods. *See Karlo*, 849 F.3d at 81. The Court will permit Dr. Kytomaa's testimony.

### C.    Motions to Seal

Finally, the Court addresses Defendant's pending Motions to Seal the Transcript of the *Daubert* Hearing and the post-*Daubert* briefs. The Court concludes that such Motions must be denied at this stage.

On July 10, 2020, the parties filed a Joint Motion to Seal their briefing and corresponding exhibits concerning their *Daubert* motions. [Docket No. 153.] On November 20, 2020, the Court granted such Joint Motion, [Docket No. 172], and as a result, the following documents were filed under seal: (1) Defendant's Brief in Support of the Bak Motion (Docket No. 110); (2) Exhibits A through M, and Q of the Certification of Patrick J. Perrone (Docket Nos. 119-1–119-14); (3) Plaintiff's Opposition to the Bak Motion (Docket No. 133); (4) Defendant's Reply Brief in Support of the Bak Motion (Docket No. 144); (5) the Supplemental Certification of Patrick J. Perrone (Docket No. 149); (6) Plaintiff's Brief in Support of the Kytomaa

Motion (Docket No. 139); (7) Defendant's Opposition to the Kytomaa Motion (Docket No. 141); (8) Plaintiff's Reply Brief in Support of the Kytomaa Motion (Docket No. 151); and (9) the Declaration of Charles J. Kocher, Exhibit 48, in Support of the Kytomaa Motion (Docket No. 151-2).

Now, because the same information as was included in the foregoing documents appears in the Transcript of the *Daubert* Hearing and the post-*Daubert* briefs, Defendant seeks to extend the Court's seal to cover such filings.  [Perrone Cert. Supp. Mot. Seal Tr. ¶¶ 10–11, Docket No. 193-1; Perrone Cert. Supp. Mot. Seal Brs. ¶¶ 10–11, Docket No. 194-1.]   As the parties claimed before, [see Docket No. 153], Defendant asserts that the foregoing filings should be subject to seal because there "is no less restrictive method of protecting the confidential, proprietary, and non-public information at issue" in the Transcript and the post-*Daubert* Briefs.  [Perrone Cert. Supp. Mot. Seal Tr. ¶ 11, Docket No. 193-1; Perrone Cert. Supp. Mot. Seal Brs. ¶ 11, Docket No. 194-1.]

At the same time, there is a "common law public right of access to judicial proceedings and records."  *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001).  It is the Defendant's burden here to show that "good cause exists" to protect the materials at issue by showing "that disclosure will work a clearly defined and serious injury." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984).  "In delineating the injury to be prevented, specificity is essential."  *In re Cendant Corp.*, 260 F.3d at 194. "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient."  *Id.*  Additionally, under Local Civil Rule 5.3(c)(3), the party seeking to

restrict public access to materials must attach to its motion an index that describes "with particularity" each of the following:

> (a)    the nature of the materials or proceedings at issues;
> (b)    the legitimate private or public interest which warrants the relief sought;
> (c)    the clearly defined and serious injury that would result if the relief sought is not granted;
> (d)    why a less restrictive alternative to the relief sought is not available;
> (e)    any prior order sealing the same materials in the pending action; and
> (f)    the identity of any party or nonparty known to be objecting to the sealing request.

L. CIV. R. 5.3(c)(3). Furthermore, "[w]hen a document to be filed contains both confidential and non-confidential information, an unredacted version of that document shall be filed under seal." L. CIV. R. 5.3(c)(4). "Thereafter, . . . a redacted, publicly available version of all corresponding filings shall be filed . . . ." *Id.*

Here, Defendant has not met its burden of demonstrating why the public's right of access to the Transcript of the *Daubert* Hearing and the post-*Daubert* briefs should be restricted. First, Defendant has not set forth why legitimate interests warrant that the entirety of such documents—wholesale—should be withheld from public view. Defendant merely recites that sealing such documents is the least restrictive means of protecting its confidential, proprietary, and non-public information. Defendant should identify such interests "with particularity," and it should explain why all of the information included in the documents at issue should be subject to seal. *See In re Cendant Corp.*, 260 F.3d at 194; L. CIV. R. 5.3(c)(3). Second, if such documents in fact contain both confidential and non-confidential information, then Defendant should

file a redacted version of such documents. *See* L. CIV. R. 5.3(c)(4). At present, the Court is not convinced that the Transcript of the *Daubert* Hearing and the post-*Daubert* briefs should be sealed in their entirety.

For similar reasons, and now that the issues have been fully presented to the Court, the Court finds that its prior Orders sealing the parties' *Daubert* briefing and corresponding exhibits and the parties' class certification briefing and corresponding exhibits should be revisited. [Docket Nos. 170, 171, & 172.] Accordingly, the Court will order the parties to file redacted versions of the referenced documents in compliance with Local Civil Rule 5.3, as the Court finds that, on the current record, they should not be sealed in their entirety. Finally, the Court will issue the instant Opinion under temporary seal pending the Court's receipt of the parties' proposed redactions of the Opinion and further Order of the Court, consistent with the Local Rule.

## V.    CONCLUSION

For the foregoing reasons set forth above, the Court will **GRANT** the Bak Motion, **DENY** the Kytomaa Motion, and **DENY** Defendant's Motions to Seal. An accompanying Order shall issue on today's date.

February 2, 2023                               s/Renée Marie Bumb
Date                                                  Renée Marie Bumb
                                                         Chief United States District Judge